CITIZENS LOAN & INVESTMENT COMPANY v. ST. PAUL
MERCURY INDEMNITY COMPANY.[1]

November 29, 1935.

No. 30,560.

*Gillette & Meagher,* for appellant.
*Donohue, Quigley & Donohue,* for respondent.

JULIUS J. OLSON, JUSTICE.

Defendant appeals from a judgment.

Action was brought to recover upon a policy of insurance issued
by defendant, as insurer, to plaintiff as the assured. The only ques-

[1]Reported in 263 N. W. 541.

tion presented upon this appeal is whether the promised indemnity on defendant's part has become operative upon the facts now to be stated. Plaintiff is engaged in the business of loaning money on collateral. As such, it had in its possession a valuable, unset diamond. On April 12, 1934, a suave and well-dressed young man came into its place of business and expressed a desire to look at it with the object of purchase, he having heard about plaintiff's ownership through a man well known to the plaintiff's officer in charge of its business. This took place immediately prior to the noon hour. As the diamond was in a bank safety deposit vault, it was arranged that he was to come back at 1:30 o'clock that afternoon. The diamond was procured during the interim, and promptly at the appointed time the prospective purchaser came back. Mr. Sharp was the man in charge of plaintiff's place of business. He invited Dunn (that was the name the young man used in introducing himself) to step into a small inclosure near the front of the room where plaintiff's business was conducted. Both men seated themselves at a small, flat-topped desk, opposite each other. The diamond was wrapped in white paper placed in an envelope. Sharp took it out of the envelope and placed it upon the desk so as to give Dunn a good chance to see it in its full glory, that part of the room being near the window and as such affording good light. They talked matters over several minutes, Dunn in the meantime examining it with critical eye. The price was set at $800. Mr. Sharp wrapped it up in the same white paper, placing it so wrapped in the envelope from which taken, and placed the envelope under a flap of his desk blotter on his side of the desk. Some further talk was had, Dunn finally suggesting that he would like to take another look at it. Sharp accommodated him, and Dunn picked it up holding it up to the light and appeared to weigh it in the palm of his hand. He took out of his inside pocket a handkerchief and pretended to polish the diamond by rubbing and manipulating it in his handkerchief. He desired to light a cigarette, and Sharp obligingly struck a match, holding it up and across the desk so Dunn might conveniently get his cigarette lighted. Immediately thereafter or while this was going on, Dunn dropped what in fact turned

out to be only a piece of cut glass upon the desk. Mr. Sharp thought something was wrong and promptly told Dunn, "That is not my diamond. I want you to put my diamond back there." Dunn became indignant and told Sharp, "You want to be careful, young fellow. You will get yourself into trouble accusing me of stealing. You will have a civil suit on your hands if you don't look out." He immediately got up, brushed past Sharp, and hurried out of the door. From there he went through the front door of a near-by hotel and thence through a back door and into the back yard thereof, where there was a parking place for automobiles. Sharp pursued him but was unable to catch him. The police department was promptly notified, but no trace of the wily Dunn has ever been found.

The policy provisions are:

" 'Robbery,' as used in this policy, shall mean a felonious and forcible taking of property: (a) by violence inflicted upon a custodian; (b) by putting him in fear of violence; (c) by an overt, felonious act committed in the presence of a custodian and of which he was actually cognizant."

Upon the facts thus presented the court submitted to the jury the single question of the value of the diamond at the time of the taking thereof by Dunn. No question is or could be raised respecting the amount of the verdict as same is well within the proof appearing in the record.

The court was of opinion that paragraph (c), quoted above, compelled a finding of liability. To this defendant's attack is directed. Many cases are cited in counsels' brief defining robbery as a criminal offense. From these it is argued that plaintiff cannot recover as the crime committed was one of losing by means of trickery and not robbery. If defendant had not defined robbery in its policy, it may well be that defendant's argument is well founded, at least to the extent that a jury question was involved. But defendant's liability is to be measured by its contract. Under paragraph (c) it chose to define as one of its promises to plaintiff that indemnity would be made if "by an overt, felonious act committed

in the presence of a custodian and of which he was actually cognizant" loss to plaintiff resulted. No amount of argument, no matter how well presented, can avoid the plain reading of defendant's undertaking. Dunn's taking was overt and felonious. That Mr. Sharp as the agent and representative of plaintiff was present and cognizant of what happened is too clear for mere sophistry to destroy.

Nor can paragraph (c) be so construed as to include the first premise, that the taking be "forcible." If so construed, paragraph (b) becomes meaningless. There, obviously, "fear" takes the place of force ("forcible"). So in paragraph (c), if "forcible" be included as a part thereof, there is added to the contract a condition out of harmony with the liability intended and expressed, thereby virtually destroying its meaning and certainly its purpose. Defendant drafted its own definition as to liability. If there be doubt as to meaning, and we think there is not, the same must be construed against it.

Affirmed.