180 So.2d 145

Issac W. JONES

v.

**AUTO OWNERS INSURANCE COMPANY.**

8 Div. 7.

Court of Appeals of Alabama.

Nov. 2, 1965.

**102**

Leon D. Sockwell, Tuscumbia, for appellant.

McDonnell & Jones, Sheffield, for appellee.

CATES, Judge.

This cause was submitted here on March 18, 1965.

The appellant assigns error in the trial judge's directing the jury to return a verdict for the appellee.

The appellant had a policy issued to him by the appellee which, as the parties stipulated, provided in pertinent part:

"To pay for loss by robbery of money, securities, merchandise, * * * within the premises.

* * * * * *

"(f) ROBBERY. The word 'robbery' means the taking of insured property (1) by violence inflicted upon a messenger or a custodian; (2) by putting him in fear of violence; (3) by any overt felonious act committed in his presence and of which he was actually cognizant, provided such other act is not committed by an officer, partner or employee of the assured, * * *"

The facts relied on to show a happening within the scope of one of the risks insured against are paraphrased from appellant's brief:

Appellee's place of business, J & P Jewelry Company, Tuscumbia, Alabama, was entered by a woman who asked about a repair job. While she was still present, another woman, accompanied by a man, entered. The latter two looked around the store for a few minutes, then advised the clerk, Eddie Reed, that they wanted to see some watches. Only the man went with Reed to the watch display counter.

The man was tall and large. The watch display counter was located in the north end of the store. Reed noticed that the two women were then engaged in talking and whispering to each other at the south end of the store.

The man proceeded to try on a number of watches, examining them and placing them upon his wrist with a motion that included doubling up his fist. The man was looking at the women and would ask particular questions about the watches in order to keep Reed's attention from the other end of the store. After a few minutes, the woman who came in with the man came up to him and suggested that they go get "the check" cashed and come back and get the watch.

The man and woman then left through the west door near the north end of the place of business. At approximately the same time, the other woman left through the door at the south end of the shop.

There were no other customers in the store during the time here of concern. Upon the three leaving the store, Reed then went to the back of the store where the watchmaker, Leo Page, was working and advised Page that something strange had happened. Reed and Page then went to the front of the store and "in five minutes" discovered that a watch was missing. "About two hours later, or something like that," a tray containing twelve diamond rings was also found to be missing.

Page testified that he observed the physical condition of Reed as being real shaky and real white. Reed testified that during the time at which the man was trying on the watches, he, Reed, was scared and that he knew something strange was going on during the time the three shoplifters were present.

To have gone to the jury, the appellant had to adduce some credible evidence within the scintilla rule that the salesclerk, Reed, had been put "in fear of violence" or that he was present and cognizant of the women's act of shoplifting, i. e., larceny.

■ Lack of either violence or of the putting in fear (of violence) is, in stealing, a demarcation of larceny from robbery. Ex parte Carson, 17 Ala.App. 345, 85 So. 827 (habeas corpus for bail granted to a pickpocket mistakenly committed for robbery).

■ Basically, this is a contract case and not a criminal appeal. Criminal law terms, if appropriate, we use only to fill in the lacunae of the policy where expressions are otherwise vague or in need of definition. Ambiguity as a reason to construe an insurance policy is never a mere excuse to ignore a plain commonly understood phrase. Laird v. Employers Liab. Assur. Corp., Ltd., 2 Terry 216, 41 Del. 216, 18 A.2d 861, 862.

■ Where the act is criminal in its consequential civil impact, we consider ourselves justified in resorting to well defined criminal law terms as understood at common law. Code 1940, T. 1, § 3. We are not in the area discussed in Home Ins. Co. v. Trammell, 230 Ala. 278, 160 So. 897.

The occasion for this observation is the need to determine whether Jones's clerk, Reed, was put in fear within the meaning of the policy.

The insurance company argues in brief as follows:

"* * * We think that the testimony of Eddie Reed, who was the only witness who testified about the occurrences in the store while the [shoplifters] were there, establishes that, if the [shoplifters] did actually take the watch and rings, a matter which we think is left entirely to speculation and conjecture, they did so by means of trick or connivance and not by putting this witness in fear of violence. * * the man was talking to him in a normal tone of voice and asking questions about the watches to keep the witness's attention from the other end of the store. There is testimony on the part of the witness, Leo Page, that Eddie Reed was shaky and white and scared when he saw him immediately after the [trio] left the store, and also testimony on the part of Eddie Reed himself that he was scared by reason

of the manner in which the man tried on the watches and doubled up his fist, but he stated on his cross-examination that he was not threatened in any way, that the * * * man was talking in a normal tone of voice and did not do anything to put the witness in fear of bodily harm. He also stated on his examination by the Court that he became afraid at the way the * * * man twisted his fist while he was trying on the watches and would say something to keep Reed from looking back at the women and that was the only thing and that there was nothing else to cause him to be afraid. Moreover, he stated that he did not know at the time the * * * man was trying on the watches, whether or not the rings and lady's watch had already been taken out of the showcase.

"We submit that, while the evidence may show that this witness was afraid that something would be stolen from the store while he was the only clerk in the front part of the store and therefore solely responsible for what went on in that part of the store, by his own testimony he was not put in fear of bodily harm or violence by anything done by the * * * man or * * * women in the store. But even if we concede, for the sake of argument, that Eddie Reed was afraid that the * * * man would do him some bodily harm, yet the evidence does not show that he parted with the possession of his employer's property under duress of such fear. * * *"

In Thomas [Thomas v. State] 91 Ala. 34, 9 So. 81, the court said:

"* * * If putting in fear is relied on, it must be the fear under duress of which the possession is parted with. The taking, as it has been expressed, must be the result of the * * * fear; and * * * fear which is a consequence, and not the means of taking, will not suffice. * * *"

Moreover, the putting in fear must be such as to induce the surrender of the property. The intimidation, whether word, gesture or manner, is that which in common experience would be likely to create an apprehension of danger, so that the victim for the sake of his own safety thereby parts with possession.

The Supreme Court of Missouri has said in State v. Parker, 262 Mo. 169, 170 S.W. 1121, L.R.A.1915C, 121:

"* * * The fright of him who is robbed must be under the law an objective fright, as contradistinguished from subjective fright; it must have been due, in short, to some act on the part of the accused, and not arise from the mere temperamental timidity of the person whose property happens to be stolen from his person or presence. * * *"

See also Peebles v. State, 138 Tex.Cr.R. 55, 134 S.W.2d 298 ("reasonably calculated" to induce parting with property).

Some cases allude to intimidation as "constructive force." State v. Sawyer, 224 N.C. 61, 29 S.E.2d 34 (hn. 5).

Summarizing, we consider the only act which could tend to support a menacing attitude would have to be the male customer's gesture of doubling up his fist while trying on a wrist watch.

On direct Reed testified on this point:

"A. He tried on one watch in particular then he pulled the one off and tried on another one, then he tried on another one. When he put it over his wrist he sort of doubled up his fist and motioned around like this (demonstrating).

"Q. Where were you standing then, Eddie?

"A. On the opposite side.

"Q. Do you have any estimate as to how wide that counter is, how much space there was on the counter top?

"A. About two feet wide.

*   *   *   *   *   *

"Q. Eddie, while you were showing watches to this Negro man, what were the two Negro women doing?

"A. They were at the other end of the store. They were talking and whispering to each other at the other end of the store.

"Q. Did they come in together or separately?

"A. Separately.

"Q. Where was the Negro man standing Eddie, in relation to where you were and where the Negro women were?

"A. We were in the north part, the north end of the store and they were about the center of the store.

"Q. Was this Negro man in between you and the Negro women or where was he?

"A. Yes, he was on the side I was on.

"Q. Eddie, as you were showing the Negro man these watches, what else did he do, if anything?

"A. I was showing him the watches, he had pointed to several different types he wanted to see. He would push aside and get another one. He tried on several watches, the only thing he did was try on several watches.

"Q. He was talking to you at that time?

"A. Yes.

"Q. How was he talking? Was it loud or gentle or what kind of voice?

"A. It was in a normal tone of voice.

"Q. What other actions did he make at that time, if any, in looking at these watches?

*   *   *   *·   *   *

"A. I noticed that he was looking at the women standing there and while he was looking he would ask a particular question about the watches to keep my attention from the other end of the store.

"Q. What happened then, Eddie?

"A. A few minutes after that, he looked at several of the watches, this lady came, the one that came in with him, she said lets go get the check cashed and come back and get the watch, then they left."

After the plaintiff rested his case, the court took the witness:

"BY THE COURT: EDDIE, THIS FEAR THAT EVERYONE SEEMS TO THINK IMPORTANT, I AM SURE THE JURY IS CONFUSED AND I KNOW I AM. YOU SAY THAT THE MAN PUT HIS ARM UP ON THE COUNTER LIKE THAT AND TRIED THE WATCH ON AND TWISTED IT AROUND LIKE THAT?

"A. Yes, sir.

"Q. WAS YOUR TESTIMONY THAT THIS WAS WHAT CAUSED YOU TO BE IN A STATE OF FEAR?

"A. It was when he did that that I was afraid something was going to happen. That is when I first began to get nervous. I knew something strange was going on.

"Q. THE THING YOU NOTICED THAT WAS STRANGE WAS THE FACT THAT HE WAS DOING THIS? (JUDGE TWISTING HIS

CLENCHED HAND IN A CIRCULAR MOTION).

"A. Usually, if someone tries a watch on if they did that I never noticed, I wouldn't pay any attention to it before, but he was twisting his wrist around.

"Q. WERE YOU IN FEAR WHEN I DID IT THEN?

"A. No, sir.

"Q. WHY WAS IT YOU WERE NOT WHEN I DID IT THEN AND YOU WERE IN FEAR WHEN HE DID IT?

"A. It was because of different circumstances.

"Q. EDDIE, I AM TRYING TO GET AT WHY YOU WERE AFRAID. CAN YOU EXPLAIN IT?

"A. It was just the way he had been acting about the watch.

"Q. HOW HAD HE BEEN ACTING ABOUT THE WATCH?

"A. He would try on several and get several out on the counter then when I looked down toward the ladies he would speak up and say something to keep me from looking at the women.

"Q. WHAT WOULD HE SAY?

"A. I don't know exactly what he said. He would just ask questions about the watch.

"Q. WAS THERE ANYTHING ELSE THAT HE DID?

"A. No, sir.

"Q. I UNDERSTAND THEN, YOU BECAME AFRAID AT THE WAY HE TWISTED HIS FIST WHILE HE WAS TRYING ON THE WATCHES AND THEN WOULD SAY SOMETHING TO YOU TO KEEP YOU FROM LOOKING BACK AT THE WOMEN?

"A. Yes, sir.

"Q. IS THAT THE ONLY THING OR IS THERE ANYTHING ELSE THAT CAUSED YOU TO BE AFRAID?

"A. No, sir."

No more accurate description of the motion of twisting the wrist and doubling of the fist has been furnished us. Since the trial judge saw the witness's actual gestures and since there is no other remote act fitting the common experience test, we think the appellant failed to make a case under the definition of robbery under (2) "by putting him in fear of violence."

As to "an overt felonious act committed in his [Reed's] presence and of which he was actually cognizant," in subdivision 3 of (f), defining robbery, we consider that the reasoning of the Kentucky Court of Appeals in Ashcraft v. United States Fidelity & Guaranty Co., 255 S.W. 2d 485, 37 A L.R.2d 1078, is persuasive.

There a shopkeeper went into the street to stop a dog fight. Thereupon two bystanders pretending to help jostled him. Returning to the shop he missed a roll of bills totalling $807.

The court affirmed the circuit court's directing a verdict for the insurance company, particularly dwelling on the failure of proof that the insured was ever aware of an overt felonious act.

Two Minnesota opinions shed light on this subdivision 3.

In London v. Maryland Cas. Co., 210 Minn. 581, 299 N.W. 193, a truck driver indoors, looking out several times, saw his parked truck (which held furs). After a lapse of "not more than 10 minutes," he noticed it was gone. Running into the street, he saw it vanish around a corner.

· Of the clause here reviewed, the Minnesota court premised its holding by observing: " * * * Clearly, this provision limits * * * cognizance to the occasion of the commission of the felonious act. Evidently, cognizance or knowledge subsequently acquired was not intended to suffice."

And, " * * * We think that so long as the custodian is actually cognizant of the felonious act *during* its commission and *before* the felons have completely removed the property, there has been compliance with subdivision (c)." [Here subdivision (3).] (Emphasis added.)

In an earlier case the court passed on the effect of the same subdivision to theft by a switch artist. Citizens Loan & Inv. Co. v. St. Paul Mercury Indemnity Co., 195 Minn. 515, 263 N.W. 541. The custodian, sensing a trick, then and there said, "That is not my diamond. I want you to put my diamond back there." This demand sufficed.

Bourg v. Travelers Indem. Co., (La. App.) 15 So.2d 166, concerned an identical policy. The court held that cognizance of the act of an accomplice was cognizance of the crime. Cf. Code 1940, T. 14, § 14.[1]

The Bourg citation has led us to Cole v. Hartford Acc. & Indem. Co., 242 Iowa 416, 46 N.W.2d 811, a case almost identical in factual setting as the one before us. There we find:

" 'Cognizant' means having cognizance. By 'cognizance' is meant knowledge, apprehension by the understanding, conscious recognition, the range of what may be known by observation. The antonyms of cognizant are unaware, uninformed. See Webster's New International Dictionary, Second Ed.; 14 C.J.S., page 1310.

" 'Actually' is a word of emphasis which means as a matter of fact; in fact, in reality, or in truth. It is distinguished from hypothesis or conjecture. It has been compared with 'positively' and is the antonym of constructive, speculative. See 1 C.J.S., page 1445; Webster's New Intl. Dictionary, Second Ed.

"Neither plaintiff nor Miss Gearhart observed or had actual knowledge or awareness of any overt felonious act by which the rings were taken. It is clear they were both unaware of any such act. Plaintiff himself testified the first knowledge he had even that the rings were missing was when he reached in the safe nearly three hours after the two men left his store. Miss Gearhart did not know the rings were gone until plaintiff so informed her. After plaintiff found the rings were missing he then questioned Miss Gearhart, and through her another clerk, as to whether either had shown the rings that afternoon.

"Plaintiff argues Miss Gearhart was actually cognizant of the taking of the rings by overt felonious act because she observed the acts of the woman accomplice while she was in the store when it is claimed the rings were taken. The argument is unsound. It is true Miss Gearhart observed the woman looking at dresser sets. But she as well as plaintiff was unaware of any overt felonious act by which the rings were taken. Miss Gearhart was without actual knowledge the men took the rings and of course was not aware the

---

[1]. "The distinction between an accessory before the fact and a principal, between principals in the first and second degree, in cases of felony, is abolished; and all persons concerned in the commission of a felony, whether they directly commit the act constituting the offense, or aid or abet in its commission, though not present, must hereafter be indicted, tried, and punished as principals, as in the case of misdemeanors."

woman was acting as accomplice in such taking.

"Plaintiff relies heavily upon a decision of an intermediate appellate court in Bourg v. Travelers Indemnity Co., La.App., 15 So.2d 166, 167. We think the agreed facts in the cited case are considerably stronger in favor of the insured than is the evidence here. There plaintiff, a lady storekeeper, 'became extremely frightened' at the acts of the accomplice who told her he did not want to buy any of the articles he had asked to see because he had no money; she screamed for help; the accomplice forcibly blocked the storekeeper's passage, rushed to a point near the money drawer, looked in that direction and hurriedly left. 'Almost simultaneously with this' a lady entered the store seeking change for a $5 bill, plaintiff went to the money drawer, discovered the telephone off the hook, the back door unlatched, the money drawer open and a sum stolen therefrom. Plaintiff realized a crime had just been committed and so phoned the police. Two days later the accomplice and his principal were arrested. They were tried and convicted.

"In the Bourg case recovery might have been placed upon the ground there was a felonious and forcible taking of property by putting the custodian in fear of violence. Further, Mrs. Bourg was aware of the overt, felonious act by which the money was stolen 'almost simultaneously' with the commission of the crime. There is more support for a finding the custodian was actually cognizant of the taking than appears here.

"We have carefully considered the decisions cited to us and several others found by our own search. None of them justifies submitting to the jury whether plaintiff or Miss Gearhart was actually cognizant of an overt felonious act by which these rings were taken."

See also Austin L. Burgess, Inc. v. Lumbermen's Mutual Cas. Co., Mass., 205 N.E. 2d 1.

The judgment below is due to be

Affirmed.