4 N.Y.3d 272 (2005)
826 N.E.2d 806
793 N.Y.S.2d 835
SOUTH ROAD ASSOCIATES, LLC, Appellant,
v.
INTERNATIONAL BUSINESS MACHINES CORPORATION, Respondent.
Court of Appeals of the State of New York.
Argued February 16, 2005.
Decided March 29, 2005.
*273 LeBoeuf, Lamb, Greene & MacRae, L.L.P., Albany (Michael W. Peters, Robert J. Alessi and Cindy M. Monaco of counsel), for appellant.
*274 Jones Day, New York City (Mark R. Seiden and Meir Feder of counsel), for respondent.
*275 John E. Zuccotti, New York City, for Real Estate Board of New York, Inc., amicus curiae.
*279 Chief Judge KAYE and Judges G.B. SMITH, GRAFFEO, READ and R.S. SMITH concur; Judge ROSENBLATT taking no part.

OPINION OF THE COURT
CIPARICK, J.
This appeal presents an issue of contract interpretation  the scope of the term "premises" as contained in the "good order and condition" provision of the parties' lease agreement. Specifically, we address whether "premises" includes the land upon which the buildings are situated or only the buildings' interior space. We conclude that "premises" as defined in the lease includes only the interior portions of the buildings.
Pursuant to a 1981 agreement between the parties, International Business Machines Corporation (IBM) leased certain space from South Road Associates (SRA) known as Buildings 952 and 982 located at 622 South Road in Poughkeepsie.[1] IBM had occupied the same space since the 1950s under previous *276 ownership and under earlier leases and had used the site for its commercial and manufacturing operations. During its occupancy of the site, IBM installed an underground storage tank to hold chemical waste. Through its own investigation, IBM discovered that the site's groundwater and soil had become contaminated by hazardous chemicals resulting from a leak in the storage tank. IBM then undertook an independent effort to clean up the site that included removal of the underground storage tank and contaminated soil.
In 1984, the parties entered into an agreement wherein IBM accepted responsibility for the pollution, agreed to hold SRA harmless for any resulting claims and agreed to "abate" the pollution "to the satisfaction of all requisite governmental agencies" and restore the land to its previous condition. After continuing remedial efforts, IBM petitioned the New York State Department of Environmental Conservation (DEC) requesting that the site be reclassified from a class 2 ("Significant threat to the public health or environment  action required") to a class 4 environmental hazard ("Site properly closed  requires continued management") (ECL 27-1305 [2] [b] [2], [4]). DEC approved the reclassification. The parties entered into a subsequent agreement in February 1994, at the termination of the lease, giving IBM a right of access to the site in order "to maintain and operate" its "monitoring wells and a groundwater `Pump and Treat System.'" SRA does not claim a breach of these two agreements.
SRA commenced this action against IBM in January 2000, alleging several causes of action including a claim for breach of contract.[2] Specifically, SRA claims a breach of article 7 of the lease which requires that the "premises" be returned in "good order and condition."[3] SRA claims that by contaminating some of the property's soil, bedrock and groundwater, IBM violated *277 its agreement to return the premises in "good order and condition."
IBM moved for summary judgment dismissing the complaint and SRA cross-moved for partial summary judgment on the issue of liability for breach of the lease provision. Supreme Court denied IBM's motion and granted SRA's cross motion. The court, allowing extrinsic evidence, found in SRA's favor, stating that the lease, read as a whole, "conveys to IBM rights, obligations, use and occupancy of a leasehold that extends beyond space referenced in the document's single precatory paragraph."
A majority of the Appellate Division reversed, determining that the "clear and unambiguous" language of the lease demonstrated that the "premises" consisted of the buildings' interior space (2 AD3d 829, 831 [2003]). One Justice dissented and voted to affirm, finding that IBM had occupied the entire property and was required pursuant to article 7 of the lease to return the entire property, rather than just the interior space, in good order and condition (2 AD3d at 833). We granted leave to appeal and now affirm.
In cases of contract interpretation, it is well settled that "`when parties set down their agreement in a clear, complete document, their writing should . . . be enforced according to its terms'" (Vermont Teddy Bear Co. v 538 Madison Realty Co., 1 NY3d 470, 475 [2004], quoting W.W.W. Assoc. v Giancontieri, 77 NY2d 157, 162 [1990]). This principle is particularly important "`in the context of real property transactions, where commercial certainty is a paramount concern, and where . . . the instrument was negotiated between sophisticated, counseled business people negotiating at arm's length'" (Vermont Teddy Bear, 1 NY3d at 475, quoting Matter of Wallace v 600 Partners Co., 86 NY2d 543, 548 [1995]). It is also important to read the document as a whole to ensure that excessive emphasis is not placed upon particular words or phrases (see Matter of Westmoreland Coal Co. v Entech, Inc., 100 NY2d 352, 358 [2003]).
The language of the lease makes clear that the term "premises" was intended to include only the interior portions of the *278 buildings. The lease states that the "premises" is the space shown on the "floor plan" consisting of a certain number of square feet "in two buildings."[4] Reading the lease as a whole also supports the interpretation that the term "premises" refers only to the interior space. The lease repeatedly mentions the "premises" separately from the water tower, appurtenances, land, parking lot and building. If "premises" was intended to include not only the interior space but also the buildings and the land surrounding the buildings, the language in these provisions would be superfluous. For example, one provision states that signs cannot be placed on the land or the outside of the building, but can be placed on the entrance doors to the premises. This provision clearly distinguishes the "premises"  as interior space  from the land and exterior portions of the building.
Whether a contract is ambiguous is a question of law and extrinsic evidence may not be considered unless the document itself is ambiguous (see Greenfield v Philles Records, 98 NY2d 562, 569 [2002]). Further, "extrinsic and parol evidence is not admissible to create an ambiguity in a written agreement which is complete and clear and unambiguous upon its face" (W.W.W. Assoc., 77 NY2d at 163 [internal quotation marks omitted]). Since the meaning of "premises" is clear and unambiguous in the lease, extrinsic evidence such as the conduct of the parties may not be considered. IBM's conduct  placing underground storage tanks in the surrounding land and cleaning the resulting pollution  is not sufficient to create an ambiguity in the lease where the language is clear. Neither may the conduct of IBM in paying all real estate taxes pursuant to a lease provision create an ambiguity. The contract, read as a whole, clearly and consistently uses the term "premises" to refer only to interior space and we cannot rely on extrinsic evidence to find otherwise.
Since there is no allegation that IBM did not return the interior space "in good order and condition," article 7 of the lease was not breached and summary judgment dismissing the complaint was properly granted to IBM.
The parties' remaining contentions are without merit.
Accordingly, the order of the Appellate Division should be affirmed, with costs.
Order affirmed, with costs.
NOTES
[1] The provision defining the specific leasehold interest states:

"That the Landlord hereby leases to the Tenant and the Tenant hereby hires and takes from the Landlord the space being more particularly shown on the attached floor plan designated Exhibit `A' (hereinafter called the `premises') consisting in the aggregate of 113,400 gross square feet in two buildings consisting of 113,400 gross square feet (hereinafter called the `buildings') situated on real property (hereinafter called the `land') located at 622 South Road (Route 9), and a Water Tower and appurtenances in the Town of Poughkeepsie, State of New York (her[e]inafter referred to as Buildings 952, 982)."
[2] The breach of contract claim is the only cause of action remaining. The other causes of action  including claims for unconstitutional taking of private property, common-law negligence, breach of a statutory duty, public nuisance, absolute nuisance and unjust enrichment  were previously dismissed by Supreme Court and are not at issue here.
[3] Article 7 states that, at the end of the lease:

"the Tenant will remove its goods and effects . . . and will (a) peaceably yield up to the Landlord the premises in good order and condition, excepting ordinary wear and tear, repairs required to be made by the Landlord, or damage, destruction or loss by fire or other casualty or by any other cause . . . and (b) repair all damage to the premises and the fixtures, appurtenances and equipment of the Landlord therein, and to the building, caused by the Tenant's removal of its furniture, fixtures, equipment, machinery and the like and the removal of any improvements or alterations."
[4] A copy of the "floor plan," Exhibit "A," was not made part of the record.