11-2644-cv
VAM Check Cashing v. Federal Insurance Company

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: August 23, 2012     Decided: November 7, 2012)

Docket No. 11-2644-cv

VAM CHECK CASHING CORP.,

*Plaintiff-Appellee*,

— v. —

FEDERAL INSURANCE COMPANY,

*Defendant-Appellant.*

B e f o r e:

KATZMANN, WESLEY, and LYNCH, *Circuit Judges*.

Plaintiff insured contends that a criminal scheme perpetrated at its store constituted "robbery" within the meaning of its crime insurance policy which the defendant insurer issued. The district court (Jack B. Weinstein, *J*.) correctly ruled that the policy's definition of "robbery" is ambiguous, that the insured offered a reasonable interpretation of the policy permitting coverage, and that the insurer was therefore liable for the loss.

AFFIRMED.

PAUL S. HUGEL, Clayman & Rosenberg LLP, New York, New York, *for plaintiff-appellee*.

ARTHUR N. LAMBERT (M. Diane Duszak, *on the brief*), Frenkel Lambert Weiss Weisman & Gordon LLP, New York, New York, *for defendant-appellant*.

GERARD E. LYNCH, *Circuit Judge*:

This case requires us to decide whether a particular criminal act constituted "robbery" within the meaning of a crime insurance policy. Because we agree with the district court that the policy is ambiguous and that the insured offers a reasonable interpretation of the policy permitting coverage, we conclude that the insurer is liable under the policy and therefore affirm the district court's grant of summary judgment to the insured.

## BACKGROUND

Plaintiff-appellee VAM Check Cashing Corp. ("VAM" or "the insured") operates a number of check cashing stores in the New York City area, including Pine Check Cashing in Brooklyn, New York. VAM purchased a crime insurance policy ("Policy") from defendant-appellant Federal Insurance Company ("Federal" or "the insurer").

During the pendency of the Policy, a group of criminals successfully tricked a Pine Check Cashing employee, Romanita Vazquez, into turning over $120,000 in cash to them. The parties do not dispute the facts of the scheme, which are detailed principally in Vazquez's three-page statement prepared after the crime.

2

Some time before noon on September 2, 2009, Vazquez received a phone call from a woman claiming to be the wife of VAM's owner. Over the course of a wide-ranging chat, the caller told Vazquez that her husband was opening three new check cashing stores, including one in Manhattan that very day. During this call, Vazquez received a second call from another woman who identified herself as the manager of the newly opened Manhattan store. The second caller said that a government official had arrived at the new store to collect a tax bill, but because the store had just opened, it had insufficient cash on hand to pay the bill. Vazquez relayed this information to the original caller, who told Vazquez that a man named Windfrey would come to Pine to collect the $100,000, and that she would be able to identify him by his use of a code number. Later, the original caller increased the amount to $120,000, and Vazquez placed that amount in a box.

Eventually, a man who identified himself as Windfrey came into the store. He offered the pre-arranged code number, and Vazquez buzzed him into the back of the store. She then handed him a box containing the $120,000 in cash, and he left. As noted by the district court, Vazquez testified at her deposition that she "never felt threatened by Mr. Windfrey," and at the time, "she did not believe he was dangerous or a thief." Vam Check Cashing Corp. v. Fed. Ins. Co., 787 F. Supp. 2d 264, 267 (E.D.N.Y. 2011).[1]

_____

[1] We assume that the failure to render "Vam" in all capital letters in the title of the reported district court decision is an oversight on the publisher's part. In any event, we adopt plaintiff's own usage and capitalize the name as "VAM Check Cashing Corp."

Over the course of the afternoon, Vazquez did not hear anything further from the owner. She gradually grew suspicious and eventually called the police that evening. The police never caught the perpetrators or recovered the money; they advised VAM that the scheme was the work of a sophisticated group of criminals that had perpetrated similar scams across the country.

After the loss, VAM made a claim under the Policy, asserting that the crime was covered under the Policy's definition of "robbery." In January 2010, however, Federal gave final notice that it denied the claim. Further negotiations between the parties to settle the claim were unsuccessful, and VAM then sued in the United States District Court for the Eastern District of New York (Jack B. Weinstein, *District Judge*) for breach of contract, claiming damages of $112,500 (the $120,000 loss less the Policy's $7500 deductible). The facts being essentially undisputed, the parties filed cross motions for summary judgment. On May 25, 2011, the district court granted summary judgment to VAM. Vam Check Cashing Corp., 787 F. Supp. 2d 264. Federal appeals.

## DISCUSSION

### I. Legal Standard

The parties do not dispute the material facts underlying the claim. The case thus turns on the interpretation of the insurance contract. Because interpretation of an insurance agreement is a question of law, we review the district court's construction of the Policy de novo. See, e.g., Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co., 411 F.3d 384, 388 (2d Cir. 2005). The parties agree that New York law governs this diversity

action because New York is the "center of gravity" of the dispute. See Lazard Freres & Co. v. Protective Life Ins. Co., 108 F.3d 1531, 1539 (2d Cir. 1997) (noting that New York federal courts must apply New York State's choice-of-law principles, including the "center of gravity" test for contract actions).

Under New York insurance law, the plain language of an insurance policy, read "in light of 'common speech' and the reasonable expectations of a businessperson," Belt Painting Corp. v. TIG Ins. Co., 795 N.E.2d 15, 17 (N.Y. 2003), will govern if the language is unambiguous. See, e.g., Fieldston Prop. Owners Ass'n, Inc. v. Hermitage Ins. Co., 945 N.E.2d 1013, 1017 (N.Y. 2011). In construing the policy consistent with these dictates,

> A reviewing court must decide whether, affording a fair meaning to all of the language employed by the parties in the contract and leaving no provision without force and effect, there is a reasonable basis for a difference of opinion as to the meaning of the policy. If this is the case, the language at issue would be deemed to be ambiguous and thus interpreted in favor of the insured.

Fed. Ins. Co. v. IBM, 965 N.E.2d 934, 936 (N.Y. 2012) (internal citations, brackets, and quotation marks omitted). "Whether a contract is ambiguous is a question of law . . . ." S. Road Assocs., LLC v. IBM, 826 N.E.2d 806, 809 (N.Y. 2005).

## II.     Analysis

The basis for VAM's claim under the Policy, and thus for its breach of contract action for failure to pay that claim, is that the events of September 2, 2009 fell within the Policy's "Robbery" clause. The Policy states in relevant part that "[Federal] shall be

5

liable for direct losses: . . . Within the Premises of Money and other property received

from sources other than the sale of Food Stamps but only when such loss is caused by: . . .

(2) Robbery or attempt thereat." The Policy defines the term:

> "Robbery" means the unlawful taking of insured property from an Insured, a partner, an Employee or any other person authorized by the Insured to have custody of the property by violence, threat of violence or other overt felonious act committed in the presence and cognizance of such person, except any person acting as a watchman, porter or janitor.[2]

The parties agree that Vazquez was an "Employee" and was not "acting as a watchman,

porter or janitor." The parties also agree that "Windfrey"[3] and his associates employed

neither actual nor threatened violence. Thus the definition can be simplified for this case:

> "Robbery" means the unlawful taking of insured property from . . . an Employee . . . by . . . overt felonious act committed in the presence and cognizance of such person . . . .

---

[2] This definition is clearly broader than the definition of robbery under the most common criminal law definitions, which generally limit the crime to larcenies committed by force or threat of force. See, e.g., 3 WAYNE R. LAFAVE, SUBSTANTIVE CRIMINAL LAW § 20.3 (2d ed. 2003) (common law robbery requires force or threat thereof); Model Penal Code § 222.1 (in addition to theft, robbery conviction requires either actual or threatened infliction of serious bodily injury on another, or actual or threatened commission of another serious felony); 18 U.S.C. § 1951 (under the federal Hobbs Act, "'robbery' means the unlawful taking or obtaining of personal property from the person or in the presence of another, against his will, by means of actual or threatened force, or violence, or fear of injury"). While the scam accomplished by Windfrey and his group was not a robbery under these definitions, that is irrelevant here. The parties to an insurance contract are free to define terms used in that contract as they choose; the question before us is solely whether the crime was a "Robbery" *as defined in the Policy*. See Thomas J. Atkins & His Five Sons, Ltd. v. Mass. Bonding & Ins. Co., 139 N.Y.S.2d 446, 447 (App. Term 2d Dep't 1955).

[3] Because we do not know his real name, we adopt the parties' usage and refer to the man who received the money by the name provided to Vazquez.

Because the parties also agree that the acts constituted the "unlawful taking of insured property," the only dispute is about the final phrase in the shortened definition: whether the unlawful taking by Windfrey and associates was an "[1] overt felonious act [2] committed in the presence and cognizance of" Vazquez.

*[1] "Overt felonious act."* Federal contends that "overt felonious act" must be read as a whole. It argues, in effect, that the adjective "overt" should be read to modify the entire phrase "felonious act," such that it covers only a "felonious act" whose *felonious character* is "overt." On that reading, though Windfrey's taking of the money was a "felonious act," and was "overt" in the sense that it was visible to Vazquez, it was not an "overt felonious act" because its felonious nature was not "overt," but covert. That is, while Vazquez knew that she was giving money to Windfrey and observed his taking it, she did not recognize that she was handing the money over to a criminal because the scheme proceeded by trickery.

VAM counters that Federal's interpretation might prevail if the Policy read "overt*ly* felonious act," in which case the adverb "overtly" would clearly modify the adjective "felonious." But since the Policy uses two consecutive adjectives, VAM contends, both "overt" and "felonious" must each separately modify the noun "act." Thus, coverage is proper if Windfrey committed an "act" that was both "overt" and "felonious." Here, VAM argues, Windfrey's act was clearly "felonious," since it amounted to larceny by trick. And it was also "overt," since the *act of taking the money*

7

was "'open, manifest; public,'" Appellee Br. 15, quoting BLACK'S LAW DICTIONARY 1258 (4th ed. 1968), even though its true criminal nature was hidden.

We cannot say that either of these two readings is definitive.  Federal's interpretation has the advantage, not argued by Federal, that it might better connect the phrase "or other overt felonious act" with the language that precedes it ("violence, [or] threat of violence") under the maxim of *ejusdem generis*.  Federal's meaning might also be thought to come closer to the common law definition (and perhaps the ordinary understanding) of the word "robbery."  See supra note 2.  As we note above, however, the criminal law definition is not controlling in this contract dispute, and the definition for which Federal argues does not correspond to the criminal definition in any event.  Nor is the connection between the criminal law meaning of robbery and the "overtly felonious" reading close enough to render the *ejusdem generis* argument especially persuasive. Finally, it cannot be said that Federal's proposed reading is grammatically impossible, or even simply incorrect.  English usage is sufficiently flexible to admit Federal's use of an adjective to modify a noun phrase, even if more careful writers would use an adverb to express the intended meaning.

Nonetheless, VAM's reading is grammatically more natural, since it does not require an adjectival word to be read adverbially.  VAM's reading thus has the advantage of respecting the plain (if strict) meaning of the contested phrase.  Nor would VAM's proposed meaning render the word "overt" meaningless.  In many forms of theft, the act of taking is itself covert; if, for example, Windfrey had grabbed a pile of cash and snuck it

8

into his pocket while Vazquez's back was turned, his act itself (not simply the true nature of the act) would presumably be considered covert.[4]

Thus, the meaning of the phrase "overt felonious act" is ambiguous standing alone. We therefore examine whether it can be clarified by the second contested phrase, "committed in the presence and cognizance of such person," or by the remaining textual context. See Fed. Ins. Co., 965 N.E.2d at 936 (before finding ambiguity, reviewing court must first "decide whether, affording a fair meaning to all of the language employed by the parties in the contract and leaving no provision without force and effect, there is a reasonable basis for a difference of opinion as to the meaning of the policy") (internal quotation marks, citations, and brackets omitted).

[2] *"Presence and cognizance."* Though the parties agree that the taking occurred "in the presence of" Vazquez, they disagree on whether it occurred in her "cognizance." Federal argues that under a large set of cases interpreting similar language in crime insurance policies across the nation and over the course of many decades, "cognizance" should be "equated with awareness of the criminal nature of the underlying act." On this view, to meet the Policy's definition, the victim employee must recognize the act "as both overt and felonious." VAM agrees that "cognizance" means "awareness," but disagrees

_____

[4] For this reason, we are not particularly persuaded by the district court's attempt to draw on the meaning of "overt act" in conspiracy law. In that context, an "overt act" is simply a physical act in furtherance of a conspiracy, beyond mere mental or verbal assent to a conspiratorial plan. As no insured loss could occur absent an "overt act" in *that* sense, the word "overt" would have no meaning in the context of the Policy if so interpreted.

9

about the object of that awareness. According to VAM, the employee need only be aware of *the act*, rather than its felonious character.

The discussion of phrase [2] adds little to our analysis of phrase [1]. Neither party's reading better gives each phrase independent meaning. Instead, the key disagreement between the parties about the meaning of [2] is essentially identical to their disagreement about the meaning of [1]. Whether expressed as a difference about the meaning of "overt" or about the object of the employee's "cognizance," the dispute is the same: Federal contends that phrase [1] means the act's *criminal character* must be possible to observe, and that phrase [2] means the act's *criminal character* must be actually noticed.[5] VAM argues that phrase [1] means the *act* must be observable, and that phrase [2] means the *act* must be in fact observed. Under either party's interpretation, then, [1] and [2] differ in the same manner: [1] is about what is observable (possible), and [2] is about what is observed (actual). Neither reading of [2] clarifies our understanding of [1] or is independently preferable to the other.[6]

---

[5] VAM argues that Federal's reading of [2] cannot be correct because it requires the employee to be aware that the act constitutes a felony, which would make coverage depend on the employee's legal acumen. Such a reading would be unlikely, but it is not an inevitable consequence of Federal's reading of "cognizance," since it would depend on the meaning given to "felonious." It is at least arguable that an ordinary businessperson would understand "felonious" to mean "criminal," rather than applying the technical legal definition of "felony." In any event, we need not resolve this quibble; for our disposition of the case, it is enough to say that the Policy is ambiguous.

[6] Following the maxim that each separate textual term should be given independent meaning if reasonably possible, see Hooper Assocs., Ltd. v. AGS Computers, Inc., 548 N.E.2d 903, 905 (N.Y. 1989), Federal argues that "overt felonious act" must be read to have separate meaning from "unlawful taking." Federal argues that VAM's reading renders "overt felonious act" surplusage, since any "act" that is also an "unlawful taking" is "felonious." This is not necessarily so, since the language could be taken to distinguish

*The effect of ambiguity*.  With Federal's textual arguments exhausted, the ambiguity remains.  As mentioned above, New York follows the maxim of *contra proferentem* in insurance cases: where the plain language of a policy permits more than one reasonable reading, a court must adopt the reading upholding coverage.  See Haber v. St. Paul Guardian Ins. Co., 137 F.3d 691, 697-98 (2d Cir. 1998) (describing New York law).  As the Supreme Court of Arkansas memorably put it, in language long ago embraced by the New York Court of Appeals,

> If [the insurer] meant to exclude liability . . . , why did it not say so in such plain language that a wayfaring man, though a fool, might not be deceived thereby?  It would appear a simple thing for a great institution, such as [the insurer], to write a clause in its policies exempting itself from such liability in plain and simple language.

Equitable Life Assurance Soc'y of U.S. v. Dyess, 109 S.W.2d 1263, 1265 (Ark. 1937), quoted in Hartol Prods. Corp. v. Prudential Ins. Co. of Am., 47 N.E.2d 687, 690-91 (N.Y. 1943).

Because the plain text of the Policy does not resolve this case, VAM must prevail if it has provided us a reasonable reading permitting recovery.  It has.  Under VAM's overall reading of the Policy provision at issue, the insured will recover for "robbery" whenever property is taken from an employee by means of an observable act that amounts

---

between felonies and misdemeanors, see supra note 5, and since some unlawful takings, as explained above, could be covert.  In any event, there are limits to the persuasiveness of readings designed solely to avoid surplusage.  It may be more natural for a reasonable businessperson to assume that contracts (and lawyers) sometimes engage in repetition, rather than that words in a policy do not mean what they apparently say.

11

to a felony, provided that the act occurs in the presence of the employee and the employee is aware of the act's occurrence. But the employee need not be aware that the act itself is felonious. As we have already explained, this interpretation is at least as plausible a reading of the language as that provided by Federal.

*Precedent*. VAM's reading accords with the result in the only case cited by either party that presents the precise question before us. In Schwegmann Bros. Giant Super Mkts. v. Underwriters at Lloyd's London, 300 So. 2d 865 (La. Ct. App. 1974), a Louisiana intermediate appellate court upheld coverage under a similar crime insurance policy. A group of criminals had observed the time that an armored truck arrived each evening to pick up money from a supermarket. A few minutes before the genuine truck was scheduled to arrive, the crooks showed up in a fake truck with fake guards wearing convincing fake uniforms. The hapless employees freely and unwittingly handed over the money from the vault, and the scheme was uncovered when the real truck arrived on time fifteen minutes later. Id. at 866-67. Thus, as in this case, theft was accomplished by a fraudulent act committed openly by the criminals such that the act itself was observable, but its felonious nature was not. The insured's employees were fully cognizant of the criminals' actions, but oblivious to the actions' felonious quality.

The insurance policy at issue in Schwegmann was quite similar to the one at issue here: it defined "robbery" to mean, inter alia, "a felonious and forcible taking of property" by violence, threat of violence, or "by *any other overt felonious act committed in the presence of a custodian and of which he was actually cognizant*, provided such overt act

is not committed by an officer or employee of the Assured." Id. at 867 (emphasis added). There, as here, the insured argued that "the proper interpretation of this clause is that the custodian must be aware of the act of taking but it is not required that the custodian know at the time of the taking that the overt act is in fact or law felonious," while the insurance company argued "that the custodian [must] know at the time of its occurrence that the overt act is of a felonious nature." Id. at 867-68. The court held that the plain language of the policy required coverage, since:

> [T]he actual taking was observed and within fifteen minutes the import of those actions, that is the felonious nature of the taking, was established. We believe this fulfills the requirement of the policy. To hold for the construction contended by [insurer], we would have to add to the policy "cognizant at the time of the act" or similar words.

Id. at 868. No contemporaneous awareness of the act's criminal nature was required: there, as here, the employee both observed the act itself and eventually became aware of the felonious character of the act. We need not hold, as the Schwegmann court did, that the insured's reading is the best one. But we find it persuasive that a court faced with similar language and similar facts upheld coverage. VAM's analogous reading under analogous facts is at least reasonable; in light of the ambiguity of the Policy's language, that is all that is necessary to decide the case.

The cases cited by Federal are less germane to the problem before us. First, Federal argues that a number of New York cases have interpreted policies containing language similar to that at issue here without finding ambiguity. But those cases do not present sufficiently similar facts to be helpful here. The same textual provision may

13

apply clearly to one set of facts but unclearly to others. <u>Cf</u>. <u>Gen. Assurance Co. v. Schmitt</u>, 696 N.Y.S.2d 72, 75 (2d Dep't 1999) ("[T]he circumstances particular to each case must be considered in construing the meaning of the term."). For example, <u>Buffalo Smoketeria, Inc. v. Metropolitan Casualty Insurance Co. of New York</u>, 258 N.Y.S. 581 (Sup. Ct. Erie County 1932), tested a different question – the definition of "in the presence of" under a similarly worded policy. And the opinion in <u>Lorenz v. Indemnity Insurance Co. of North America</u>, 94 N.Y.S.2d 25 (App. Term 1st Dep't 1949), is so brief and cryptic as to be entirely unenlightening.

Second, Federal cites a number of cases from other jurisdictions in favor of its reading. But again, and in contrast to <u>Schwegmann</u>, these cases involve thefts in which the act itself was covert, and thus do not address the key dispute between the parties: whether the act itself, or its criminal nature, must be apparent to, and observed by, the insured's employee at the time of its occurrence. <u>Schwegmann</u> is the only cited case applying a similarly worded policy on facts where an agent of the insured observes the *act*, but not its *criminal nature*.

Thus, for example, in <u>Jones v. Auto Owners Insurance Co.</u>, 180 So. 2d 145 (Ala. Ct. App. 1965), a jewelry store clerk felt something was amiss after a group of shoppers left, and after investigation discovered that watches and rings were missing. But the clerk could not have observed, and did not observe, the legerdemain by which the property was taken (that is, the felonious act). As the <u>Jones</u> court stated,

> It is true [that the clerk] observed the woman looking at dresser
> sets. But she . . . was unaware of any overt felonious act by

14

which the rings were taken. [She] was without actual knowledge the men took the rings and of course was not aware the woman was acting as accomplice in such taking.

Id. at 151-52. Although the Jones court denied coverage under a policy with similar language, the insured's agent in that case observed neither the act nor its felonious character, and the case is therefore unhelpful here. Much the same is true of Still v. Great Central Insurance Co., 176 S.E.2d 268 (Ga. Ct. App. 1970), in which no one saw a bag of cash being removed from underneath the counter, and Ashcraft v. United States Fidelity & Guaranty Co., 255 S.W.2d 485 (Ky. 1953), in which the insured's agent "was not aware or, as the policy states it, 'actually cognizant', of any act involving the abstraction of the $807 from his person," id. at 486, since he was aware only that he had been jostled by a group of men while they were all apparently trying to break up a fight between two dogs.[7]

Finally, it is clear that the theft here falls within VAM's proposed reading of the Policy. Federal offers little analysis of which "act" (or acts) should be considered relevant. But since the act must effect an "unlawful taking of insured property," we agree with VAM that the most relevant act was the obvious, readily observable action of Windfrey in taking the box of cash. That act was clearly "felonious," was "overt" in the sense of being observable, and was both within Vazquez's physical "presence" and her "cognizance," since she was aware of his request for the money and her act of giving it to him. We therefore hold that coverage was proper under VAM's reasonable reading.

---

[7] Federal also offers a number of objections to the district court's reasoning, but because we have made our own de novo review of the Policy's language, we need not address those contentions.

15

## CONCLUSION

The district court correctly held that the Policy's language was ambiguous and that VAM presented a reasonable reading permitting coverage. We therefore AFFIRM the district court's judgment.