[763 NYS2d 56]

Atlantic Mutual Insurance Company, Respondent, v Terk Technologies Corp., Appellant. (And a Third-Party Action.)

First Department, August 14, 2003

## APPEARANCES OF COUNSEL

*Melissa A. Murphy-Petros* of counsel (*Edward M. Kay, Amy Rich Paulus* and *Michelle R. Valencic* on the brief; *Clausen Miller, P.C.*, attorneys), for respondent.

*Robert M. Sullivan* of counsel (*David H. Paige* and *Frederick M. Klein* on the brief; *Nicoletti Hornig Campise Sweeney & Paige*, attorneys), for appellant.

## OPINION OF THE COURT

NARDELLI, J.

The issue presented to us in this appeal is whether plaintiff Atlantic Mutual Insurance Company was obligated to indemnify and/or defend defendant and third-party plaintiff Terk Technologies Corp. in an underlying action involving, inter alia, defendant's violation of the Lanham Trademark Act.

### The Parties

Defendant and third-party plaintiff Terk Technologies Corp. (Terk) is a New York corporation in the business of producing, importing and distributing upscale consumer electronics equipment. Plaintiff Atlantic Mutual Insurance Company (Atlantic) is an insurance company licensed, inter alia, to write insurance policies in the State of New York. Third-party defendant Hiram Cohen & Son, Inc. (Cohen) is an insurance broker and agent licensed to do business in the State of New York, and is an authorized agent of Atlantic. In 1993, Atlantic, through Cohen, issued Terk an "Insurance for Electronics Industry" commercial general liability policy for the period of June 15, 1993 to June 15, 1994. The policy, containing essentially the same terms in each policy year, was renewed on an annual basis through June 15, 1997 (to be collectively referred to herein as the Policy).

### The Underlying Action

Tommy Larsen is a Danish designer of high-quality products of applied decorative art, which are intended to be useful as well as aesthetically and artistically appealing in form and appearance. Larsen's products are manufactured and distributed worldwide through his Danish corporation, Tommy Larsen

ApS.[1] On or about June 14, 1995, Tommy Larsen and Tommy Larsen ApS (collectively to be referred to herein as Larsen) commenced an action against Terk in the United States District Court for the District of Maryland by the service and filing of a summons and complaint, asserting that Terk violated the Lanham Trademark Act (15 USC § 1051 *et seq.*), the Maryland Consumer Protection Act (Md Code Ann, Com Law § 13-201 *et seq.*) and the common law, in that it engaged in unfair and deceptive trade practices. The Larsen plaintiffs subsequently served an amended complaint on November 7, 1995, at the direction of the District Court, which contained the identical facts and allegations but eliminated any reference to the Maryland Consumer Protection Act.

Larsen maintained that in 1992 he designed and initiated the European distribution of a decorative compact disc (CD) holder called the "CD 25," which is manufactured from a single piece of solid steel tubing bent and curved into a sculpture-like storage unit that holds 25 CD cases. The CD 25, which is sold in a black box bearing the Tommy Larsen and Tommy Larsen ApS names and logo, is available in either a black or chrome finish, and is produced in Denmark according to Larsen's "exacting" size and material specifications.

After the product's successful debut in the European market, Larsen sought to introduce the product in the United States. In August 1993, Neil Terk, the Chief Executive Officer of Terk, approached Larsen at a trade show in Berlin, Germany and began discussions concerning Terk's possible distribution of the CD 25 in the United States. Larsen's and Terk's subsequent negotiations over the next several weeks culminated in an October 1993 agreement under which, inter alia, Larsen agreed to ship the CD 25 in bulk and allow Terk to develop and produce its own packaging in order to reduce Terk's costs. The packaging, which was subject to Larsen's approval, included the "Tommy Larsen" and "Tommy Larsen ApS" names, the Larsen logo, and identified the CD 25 as "Made in Denmark" and "Design of Denmark."

Larsen began shipping the CD 25 to Terk in November 1993 and Terk thereafter commenced distribution of the CD 25 for sale in upscale electronics, housewares and department stores, as well as through mail order catalogs featuring high-quality products and objects of applied art. The CD 25 was awarded

---

**1.** Subsequent to the commencement of the federal action, the corporation changed its status under Danish law and is now referred to by the denomination "AS."

the "Innovations 94" award at the 1994 International Summer Consumer Electronics Show in Chicago, and Terk, in its continuing marketing efforts, which included press releases, catalogs, advertising and trade show materials, identified and promoted the CD 25 as a Tommy Larsen product, a Tommy Larsen design, and as a product manufactured in Denmark.

Despite the CD 25's apparent favorable reception and commercial success in the United States market, by late 1994, Terk's orders for the CD 25 had ceased. The absence of orders for the CD 25 prompted inquiries from Larsen, to which Terk responded that the rate of sales was low and that it currently had a large inventory of the product. In reality, Terk was having the CD 25 produced by a local New York State manufacturer, and was packaging and marketing the counterfeit units in the same gift boxes originally designated for Larsen's products, which bore the Larsen name and logo and was designated as a "Design of Denmark" and "Made in Denmark."

Larsen, however, understandably had become suspicious of the CD 25's purported debacle in the American market and, as a result, had an associate purchase samples of the CD 25 at retail in the United States. At that point, it became apparent to Larsen that despite the packaging, the CD 25s had not been produced by Larsen, but were copies of vastly inferior quality.[2]

### The Federal Dispositions

A two-day nonjury trial was held before Judge Peter J. Messitte on November 19 and 20, 1996 and Judge Messitte rendered a verdict in open court in Larsen's favor on November 20, 1996. In a written judgment entered on November 27, 1996, the District Court found, inter alia: that "[d]efendant has committed trademark infringement, false designation of origin, false and misleading representations and false advertising," in violation of the Lanham Act; and that Terk intentionally, willfully, knowingly, surreptitiously and fraudulently passed off counterfeit goods of inferior quality as Larsen's authentic, Danish-made goods. Judge Messitte awarded Larsen treble damages in the amount of $217,779.78 (15 USC § 1117 [b]), plus attorneys' fees. Terk appealed, and the United States

---

2. Indeed, the District Court noted that the counterfeit CD 25s were inferior in quality and materials, did not have the clean, sharp lines characteristic of the Danish design, and a standard CD case did not fit in the counterfeit units unless forced. Moreover, the rubber tubing on the base was loose enough to come off, and left black marks on furniture surfaces.

Court of Appeals for the Fourth Circuit affirmed on July 14, 1998 (*see Larsen v Terk Techs. Corp.,* 151 F3d 140 [1998]).[3]

## The Present Action

Terk maintains that immediately after being served with the summons and complaint in the underlying action, it inquired of Cohen as to whether or not that action was covered under the Policy, to which Cohen purportedly answered in the negative. Terk, claiming that it relied on Cohen's expertise, did not file a written notice of claim with Atlantic until May 30, 1997, which was after the District Court had entered judgment and Terk had filed a notice of appeal.

Atlantic subsequently denied coverage by letter dated September 22, 1997, based upon Terk's late notice of suit and the "knowledge of falsity" exclusion to the advertising injury coverage provided by the Policy. On September 23, 1997, Atlantic commenced the within declaratory judgment action seeking a declaration that it was not obligated to defend or indemnify Terk. Terk joined issue on or about January 16, 1998, and interposed four counterclaims based, primarily, on Atlantic's alleged bad faith. Terk thereafter commenced a third-party action against Cohen for, inter alia, indemnification and contribution arising out of Cohen's alleged failure to timely submit a notice of claim to Atlantic. Atlantic and Cohen subsequently moved for summary judgment and Terk cross-moved for the same relief.

The motion court, in a ruling rendered in open court on February 28, 2002, and later incorporated into a short-form order, granted Atlantic's and Cohen's motion for summary judgment and denied Terk's cross motion, holding that Atlantic had no duty to indemnify or defend Terk based upon the provisions of the Policy. The motion court concluded that, given those findings, it was unnecessary to reach the issues surrounding Terk's purported late notice to Atlantic and whether or not there was any third-party liability on the part of Cohen. Terk appeals and we now affirm.

## Discussion

### The Relevant Policy Provisions

The Policy, under the heading "COVERAGE B. PERSONAL AND ADVERTISING LIABILITY," provides, in pertinent part:

---

**3.** The Court of Appeals, in discussing the factual findings of the District Court, noted that "[a]mazingly, Terk continued to take orders for TOMMY LARSEN CD 25s, and fill those orders with counterfeit CD 25s, for at least six months after Larsen filed this lawsuit." (*Id.* at 144.)

"1. Insuring Agreement.

"a. We will pay those sums that the insured becomes legally obligated to pay as damages because of 'personal injury' or 'advertising injury' to which this insurance applies. We will have the right and duty to defend any 'suit' seeking those damages. We may at our discretion investigate any 'occurrence' or offense and settle any claim or 'suit' that may result * * *

"b. This insurance applies to:

"(2) 'Advertising Injury' caused by an offense committed in the course of advertising your goods, products or services;

"but only if the offense was committed in the 'coverage territory' during the policy period.

"2. Exclusions.

"This insurance does not apply to:

"a. 'Personal injury' or 'advertising injury'

"(1) Arising out of oral or written publication of material, if done by or at the direction of the insured *with knowledge of its falsity*" (emphasis added).

Section V of the Policy, under the banner "DEFINITIONS," provides:

"1. 'Advertising injury' means injury arising out of one or more of the following offenses:

"a. Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

"b. Oral or written publication of material that violates a person's right of privacy;

"c. Misappropriation of advertising ideas or style of doing business; or

"d. Infringement of copyright, title or slogan."

*Duty to Indemnify*

The duty to indemnify "is determined by the actual basis for the insured's liability to a third person" (*Servidone Constr. Corp. v Security Ins. Co. of Hartford*, 64 NY2d 419, 424 [1985]; *see also Frontier Insulation Contrs. v Merchants Mut. Ins. Co.*, 91 NY2d 169, 178 [1997]; *Robbins v Michigan Millers Mut. Ins. Co.*, 236 AD2d 769, 770-771 [1997]), and does not turn on the pleadings, but rather on whether the loss, as established by the facts, is covered by the policy (*New York City Hous. Auth. v Commercial Union Ins. Co.*, 289 AD2d 311, 313 [2001]; *Erdman v Eagle Ins. Co.*, 239 AD2d 847, 849 [1997], *lv denied in part and dismissed in part* 90 NY2d 926 [1997]; *Ingber v Home Ins. Co.*, 140 AD2d 750, 751 [1988]).

In this matter, we harbor no doubt that Terk's conduct falls within the "knowledge of falsity" exclusion set forth in the Policy. Indeed, the facts, as determined by the District Court, are that Terk knowingly and intentionally obtained counterfeit CD 25s from Allen Machine Products; that Terk distributed the counterfeit CD 25s in packaging it developed for authentic Larsen CD 25s, which bore Larsen's name and logo and stated the product was made in Denmark; and that Terk distributed the inferior product as a genuine Larsen product. The Fourth Circuit Court of Appeals, in affirming the District Court, held that "the district court was correct in finding that Terk intentionally, willfully, knowingly, surreptitiously and fraudulently passed off counterfeit goods of inferior quality as Larsen's authentic Danish-made goods." (151 F3d at 149.)

In view of the foregoing, we can only conclude that Terk's actions fall squarely within the Policy's exclusion for "advertising injur[ies]" which arise out of the insured's publication of material "with knowledge of its falsity." Moreover, the issue of whether a provision in an insurance policy is ambiguous is a question of law for the court to determine (*Breed v Insurance Co. of N. Am.*, 46 NY2d 351, 355 [1978]; *Thomson v Power Auth. of State of N.Y.*, 217 AD2d 495, 496 [1995]), and a provision in an insurance contract is not ambiguous merely because the parties interpret it differently (*Mount Vernon Fire Ins. Co. v Creative Hous.*, 88 NY2d 347, 352 [1996]; *Board of Mgrs. of Yardarm Condominium II v Federal Ins. Co.*, 247 AD2d 499, 500 [1998]). Here, we find no ambiguity and reject, as without basis in the language of the Policy, Terk's assertion that the "knowledge of falsity" exclusion applies only to oral and written publication of material and not to the misappropriation of advertising or marketing ideas. In any event, Terk did engage

in the publication of promotional material, and the manufacture of packaging for the CD 25 that it knew was false. Accordingly, we agree with the motion court that Atlantic bore no duty to indemnify Terk for the damages it sustained as a result of the underlying action.

*Duty to Defend*

The duty of an insurer to provide a defense for its insured is distinct from, and far broader than, its duty to indemnify (*Fitzpatrick v American Honda Motor Co.*, 78 NY2d 61, 65 [1991]; *Pavarini Constr. Co. v Liberty Mut. Ins. Co.*, 270 AD2d 98, 99 [2000]; *79th Realty Co. v X.L.O. Concrete Corp.*, 247 AD2d 256, 257 [1998]). The insured's right to representation, and the insurer's concomitant duty to defend a suit, no matter how groundless or fraudulent, are "in a sense 'litigation insurance' expressly provided by the insurance contract" (*Servidone Constr. Corp. v Security Ins. Co. of Hartford, supra* at 423-424, quoting *International Paper Co. v Continental Cas. Co.*, 35 NY2d 322, 326 [1974]; *National Amusements v Scottsdale Ins. Co.*, 253 AD2d 396 [1998]). An insurer's duty to defend is triggered whenever allegations set forth in a complaint state a cause of action that gives rise to a reasonable possibility of recovery under the policy (*Town of Massena v Healthcare Underwriters Mut. Ins. Co.*, 98 NY2d 435, 443 [2002]; *Technicon Elecs. Corp. v American Home Assur. Co.*, 74 NY2d 66, 73 [1989]; *Fitzpatrick v American Honda Motor Co., supra* at 65; *Gibbs v CNA Ins. Cos.*, 263 AD2d 836, 837 [1999], *lv denied* 94 NY2d 755 [1999]).

Conversely, if the allegations interposed in the underlying complaint allow for no interpretation which brings them within the policy provisions, then no duty to defend exists (*Northville Indus. Corp. v National Union Fire Ins. Co. of Pittsburgh*, 218 AD2d 19, 24-25 [1995], *affd* 89 NY2d 621 [1997]; *Nancie D. v New York Cent. Mut. Fire Ins. Co.*, 195 AD2d 535, 536 [1993]). "[A]n insurer can be relieved of its duty to defend if it establishes as a matter of law that there is no possible factual or legal basis on which it might eventually be obligated to indemnify its insured under any policy provision" (*Allstate Ins. Co. v Zuk*, 78 NY2d 41, 45 [1991]; *see also Morse Diesel Intl. v Olympic Plumbing & Heating Corp.*, 299 AD2d 276, 277 [2002]), and an insured may not "by use of a 'shotgun' allegation, create a duty to defend beyond that which was anticipated by the parties when they entered into the policy contract" (*Village of Newark v Pepco Contrs.*, 99 AD2d 661, 662 [1984], *affd* 62 NY2d 772 [1984]; *see also Nancie D. v New York Cent. Mut.*

*Fire Ins. Co., supra* at 536-537). Moreover, if the insurer, in denying coverage, relies upon an exclusion clause, the burden rests upon the insurance company to demonstrate that the allegations of the complaint can be interpreted only to exclude coverage (*Town of Massena v Healthcare Underwriters Mut. Ins. Co., supra* at 444; *International Paper Co. v Continental Cas. Co., supra* at 325; *Northville Indus. Corp. v National Union Fire Ins. Co. of Pittsburgh, supra* at 25). While the insurer's burden is a heavy one, the court should not impose a duty to defend on an insurer "through a strained, implausible reading of the complaint 'that is linguistically conceivable but tortured and unreasonable' " (*Northville Indus. Corp. v National Union Fire Ins. Co. of Pittsburgh,* 89 NY2d 621, 635 [1997], quoting *State of New York v AMRO Realty Corp.,* 936 F2d 1420, 1428 [2d Cir 1991]).

Initially, Terk argues that the motion court, in reaching its determination that Atlantic bore no duty to defend Terk, did not consider the pleadings in the underlying action but, rather, improperly relied on the District Court's ultimate factual findings. In support of its argument, Terk quotes various segments, at length, from the transcript of the proceedings at which the motion court rendered its decision.

In response to Terk's protestations, we first note that the duty to defend is not an inflexible rule but, rather, one of expedience (*see generally Kajima Constr. Servs. v CATI, Inc.,* 302 AD2d 228 [2003]), which duty, as we stated earlier, expressly arises out of the insurance contract. In this matter, because the underlying action has been fully adjudicated and there can no longer be any doubt that Terk's conduct was fraudulent and, therefore, outside of the policy's coverage, no duty to defend provided by that insurance contract can possibly arise.

A review of the transcript, in any event, reveals that Justice Moskowitz embarked on a well-defined, two-prong analysis that clearly delineated the obligations of an insurer regarding its duty to indemnify vis-à-vis its duty to defend. What we find disturbing is that despite the clarity with which the motion court addressed these issues, Terk either intentionally mischaracterizes, or completely misapprehends, the motion court's ruling as it continually quotes from that branch of the decision addressing Atlantic's duty to indemnify, and not its duty to defend. In any event, we find that the motion court accurately, and clearly, articulated the proper standards in this matter.

Terk also maintains that the allegations of the Larsen complaint do not fall wholly within the "knowledge of falsity"

exclusion, thereby obligating Atlantic to defend Terk in that action, because: (1) a violation of the Lanham Act does not require intent; and (2) the complaint asserts that Terk acted with "reckless disregard" of Larsen's rights. We disagree.

Terk is correct in that the Lanham Act "does not require proof of intent to deceive" (*Johnson & Johnson v Carter-Wallace, Inc.*, 631 F2d 186, 189 [1980]). As a result, some New York courts have found that allegations that an insured has violated the Lanham Act do not fall within the parameters of a "knowledge of falsity" exclusion and that, therefore, the insurer has a duty to defend (*see PG Ins. Co. of N.Y. v S.A. Day Mfg. Co.*, 251 AD2d 1065 [1998]; *Massachusetts Bay Ins. Co. v Penny Preville, Inc.*, 1996 WL 389266, 1996 US Dist LEXIS 9671 [SD NY, July 10, 1996]).

This Court, however, in *A.J. Sheepskin & Leather Co. v Colonia Ins. Co.* (273 AD2d 107 [2000]), a declaratory judgment action which, like the matter before us, arose out of a federal action based upon section 43 (a) of the Lanham Act (15 USC § 1125 [a]), held that:

> "The motion court correctly found that defendant insurer was under no duty to defend and indemnify plaintiff insured * * * in the underlying Federal action, because the allegations of the complaint in that action, setting forth claims of trademark infringement [were] * * * premised, without exception, upon conduct both knowing and intentional [and] fell wholly within the exclusion in the subject insurance policy pertaining to advertising injury 'arising out of oral or written publication of material; if done by or at the direction of the insured with knowledge of its falsity.'" (*Id.* at 107; *see also Mulberry Sq. Prods., Inc. v State Farm Fire & Cas. Co.*, 101 F3d 414, 422-423 [1996]; 5 McCarthy, Trademarks and Unfair Competition § 33:16 [4th ed].)

Our holding in *Sheepskin* finds support in other cases involving intentional conduct on the part of the insured where no duty to defend was found on the part of the insurer despite the fact that the complaint in the underlying action contained allegations of negligence (*see e.g. Allstate Ins. Co. v Mugavero*, 79 NY2d 153, 163 [1992] [holding that the characterization of intentional acts, such as "intentional, forceful and violent assault, sodomy and sexual abuse," as "negligently and carelessly" committed, does not remove such acts from the purview

of policy exclusions for intentional acts]; *Gibbs v CNA Ins. Cos.*, 263 AD2d 836, 838, *supra* [1999] [sexual molestation of a child is "intentionally caused" within the meaning of the policy exclusions despite allegations premised upon acts constituting negligence]; *Bingham v Atlantic Mut. Ins. Co.*, 215 AD2d 315, 316 [1995] ["(t)hat allegations of mental suffering can be based on both intentional and unintentional causes of action is not dispositive; what is material to the duty to defend is that the acts alleged in the counterclaims are all intentional. Awkward draftsmanship aside, the insurer is entitled to rely on the exclusion as a matter of contract law"]; *New York Cas. Ins. Co. v Ward*, 139 AD2d 922 [1988] [summary judgment granted to insurer where the insured committed assault, notwithstanding conclusory assertions of negligence]; *Home Mut. Ins. Co. v Lapi*, 192 AD2d 927 [1993] [no duty to defend despite allegations of carelessness and recklessness in complaint where insured, allegedly under the influence of alcohol, committed an assault]; *Contracting Plumbers' Coop. Restoration Corp. v Hartford Acc. & Indem. Co.*, 59 AD2d 921, 922 [1977], *affd* 46 NY2d 857 [1979] [insurer had no duty to defend where the facts pleaded put the occurrences outside locations covered by the policy despite general "shotgun" allegations of negligence]).

In this matter, notwithstanding the fact that a violation of the Lanham Act can be unintentional, and that the complaint in the federal action asserts that Terk acted with "reckless disregard," we can discern no justification from the factual allegations set forth in the complaint to impose a duty to defend Terk upon Atlantic. Indeed, it is impossible to envision how Terk could have unknowingly, and unintentionally, approached a local manufacturer to produce a cheaper, low-quality knockoff of the CD 25; marketed the counterfeit product in packaging indicating it was a genuine Larsen creation manufactured in Denmark, both blatantly false; and then fraudulently misled Larsen when he inquired as to poor sales, indicating that demand was low, whereas the counterfeit product was enjoying vigorous sales. Since all of the factual allegations of the complaint are premised on intentional, "knowing" conduct, they fall squarely within the "knowledge of falsity" exclusion in the Policy and we therefore agree with the motion court that Atlantic had no duty to defend Terk.

Accordingly, the judgment of the Supreme Court, New York County (Karla Moskowitz, J.), entered June 12, 2002, which, inter alia, declared that Atlantic had no duty to defend or indemnify Terk in the underlying federal action brought by

Tommy Larsen and Tommy Larsen ApS against Terk, should be affirmed, without costs.

ANDRIAS, J. (concurring in result only). While I agree that Atlantic had no duty to defend Terk since all of the factual allegations in the complaint are premised on intentional "knowing" conduct and fall squarely within the "knowledge of falsity" exclusion in the policy, I disagree with the majority's reliance, in what seems to be dicta, upon the outcome of the underlying federal action as additional justification for such conclusion. The majority aptly states the well-settled principle that if the allegations in the underlying complaint allow for no interpretation which brings them within the policy provisions, then no duty to defend exists. That should be where the inquiry ends and there is no reason to go further and to decide an issue not raised by the parties. The majority's reliance upon our recent decision in *Kajima Constr. Servs. v CATI, Inc.* (302 AD2d 228 [2003]) is misplaced since there the issue was whether one insurance carrier or another would be required to afford primary or excess coverage to their insured, which determination could not be made until a determination as to liability was made in the underlying action. The only mention of the insurer's duty to defend related to the issue of defense expenses. Since the insured was already being defended by one of the carriers, there was no practical need for the other insurer to contribute to that effort given that the issue of coverage with respect to indemnity was necessarily deferred pending a determination of the underlying action, which determination would also resolve the issue of primary responsibility for defense expenses. Such decision adds nothing to the issue decided here and its citation as authority for the statement that the duty to defend "is not an inflexible rule but, rather, one of expedience" is, in the context of this case, a non sequitur and is liable to create mischief in the future.

BUCKLEY, P.J., SULLIVAN and FRIEDMAN, JJ., concur. ANDRIAS, J., concurs in result only in a separate opinion.

Judgment, Supreme Court, New York County, entered June 12, 2002, affirmed, without costs.