11-2647-cv
CGS Indus., Inc. v. Charter Oak Fire Ins. Co.

# UNITED STATES COURT OF APPEALS
## FOR THE SECOND CIRCUIT

August Term, 2012

(Argued: October 1, 2012    Decided: June 11, 2013)

Docket No. 11-2647-cv

CGS INDUSTRIES, INCORPORATED, A FLORIDA CORPORATION,

*Plaintiff-Appellee,*

— v. —

CHARTER OAK FIRE INSURANCE COMPANY, A CONNECTICUT CORPORATION,

*Defendant-Appellant.*

B e f o r e:

NEWMAN, LYNCH and LOHIER, *Circuit Judges.*

Defendant-appellant Charter Oak Fire Insurance Company ("Charter") appeals

from a judgment of the Eastern District of New York (Jack B. Weinstein, *Judge*) holding

it liable to plaintiff-appellee CGS Industries, Inc. for CGS's defense and settlement costs

in an underlying trademark infringement lawsuit.  We hold that Charter breached its duty

to defend CGS and is liable for its defense costs, but that it did not have a duty to

indemnify CGS and is not liable for its settlement costs. We therefore VACATE the judgment and REMAND to the district court for further proceedings consistent with this opinion.

---

DAVID A. GAUNTLETT (Andrew M. Sussman, *on the brief*), Gauntlett & Associates, Irvine, California, *for Plaintiff-Appellee*.

WILLIAM THOMAS CORBETT, JR. (Laura A. Brady, *on the brief*), Drinker Biddle & Reath LLP, Florham Park, New Jersey, and Stuart M. Bodoff, Cheryl F. Korman, and Celeste M. Butera, Rivkin Radler, LLP, Uniondale, New York, *for Defendant-Appellant*.

---

GERARD E. LYNCH, *Circuit Judge*:

This case requires us to revisit the world of "advertising injury" insurance coverage. Defendant-appellant Charter Oak Fire Insurance Company ("Charter") appeals from a judgment of the United States District Court for the Eastern District of New York (Jack B. Weinstein, *Judge*), holding it liable to plaintiff-appellee CGS Industries, Inc. ("CGS") for its expenses in defending and settling a trademark infringement suit. CGS Indus., Inc. v. Charter Oak Fire Ins. Co., 777 F. Supp. 2d 454 (E.D.N.Y. 2011). We conclude that the relevant insurance policy did not cover the liability alleged in the trademark action, and that Charter is therefore not liable for the settlement amount. We also conclude, however, that at the time CGS asked Charter to defend the trademark lawsuit, there was sufficient legal uncertainty about the coverage issue to oblige Charter to defend the action. We therefore affirm the district court's ruling insofar as it holds

2

Charter liable for defense costs, but reverse insofar as it holds Charter liable for the settlement. We accordingly vacate the judgment of the district court and remand for further proceedings consistent with this opinion.

## BACKGROUND

### I.     Facts

On December 23, 2009, Five Four Clothing, Inc. ("Five Four") sued Wal-Mart Stores, Inc. ("Walmart") for trademark infringement based on CGS's use of Five Four's distinctive rear pocket stitching design (the "FF stitching") on jeans that CGS supplied to Walmart, which Walmart then sold.[1]  CGS was later added as a named defendant.  CGS asked Charter to defend it pursuant to its liability insurance policy (the "Policy").  Charter refused, claiming that the Underlying Action was not covered by the Policy.  Eventually, CGS settled the Underlying Action by agreeing to pay $250,000 to Five Four on behalf of both CGS and Walmart.[2]

The Policy, effective from August 31, 2009 to August 31, 2010, provides, in relevant part, that Charter:

> will pay those sums that the insured becomes legally
> obligated to pay as damages because of . . . "advertising
> injury" . . . to which this insurance applies.  [Charter] will
> have the right and the duty to defend the insured against any
> "suit" seeking those damages, even if the allegations of the

---

[1] We refer to Five Four's lawsuit henceforth as "the Underlying Action."

[2] CGS settled Walmart's liability based on an indemnification provision in its supplier agreement with Walmart.

3

"suit" are groundless, false or fraudulent. However, [Charter] will have no duty to defend the insured against any "suit" seeking damages . . . to which this insurance does not apply.

Joint App'x 164. The Policy covers "'[a]dvertising injury' caused by an offense committed in the course of advertising your goods, products or services." Id. It defines "advertising injury" as injury arising out of one or more specifically listed offenses, including "[i]nfringement of copyright, title or slogan." Id. at 167. The Policy excludes coverage for advertising injury: (1) "caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict . . . 'advertising injury'"; or (2) "arising out of oral, written or electronic publication of material, if done by or at the direction of the insured with knowledge of its falsity." Id. at 164. It also excludes advertising injury "for which the insured has assumed liability in a contract or agreement." Id. at 165. That exclusion, however, does not apply to advertising injury liability "that the insured would have in the absence of the contract or agreement." Id.

## II.    Procedural History

On July 13, 2010, CGS sued Charter for breach of its duty to defend. The parties cross-moved for summary judgment.[3] On November 16, 2010, the district court granted CGS's motion for partial summary judgment and denied Charter's cross-motion, finding

---

[3] While Charter initially moved for judgment on the pleadings, the district court converted its motion into one for summary judgment. CGS Indus., Inc. v. Charter Oak Fire Ins. Co., 751 F. Supp. 2d 444, 448 (E.D.N.Y. 2010).

that Charter had breached its duty to defend CGS in the Underlying Action. CGS Indus., Inc. v. Charter Oak Fire Ins. Co., 751 F. Supp. 2d 444, 453 (E.D.N.Y. 2010). After further discovery, Charter moved for partial summary judgment, seeking a declaration that CGS was not entitled to indemnification for Walmart's defense costs or for the portion of the settlement that resolved Walmart's liability. On April 15, 2011, the district court granted the motion in part and denied it in part, holding that Charter was not obliged to reimburse CGS for Walmart's defense costs, but was obliged to indemnify CGS for damages. CGS Indus., 777 F. Supp. 2d at 456-57, 462.

On June 3, 2011, rather than go to trial to determine the amount of damages, the parties stipulated that damages were $396,342.53, calculated as the $250,000 settlement plus CGS's defense costs in the Underlying Action. In the stipulation, Charter reserved its rights to appeal all issues except the reasonableness of the defense costs and settlement amount. The district court entered judgment for CGS in the amount of $396,342.53 on June 8, 2011.

Charter now appeals the judgment and seeks review of the district court's rulings on the various motions for summary judgment, arguing that it did not have a duty to defend CGS under the policy because: (1) CGS's copying of the FF stitching did not constitute an infringement of "slogan" or "title" within the meaning of the Policy; (2) the Underlying Action did not allege that CGS committed a covered offense in the course of advertising; and (3) the Policy's "knowledge of falsity" and "knowing violation" exclusions precluded coverage for the Underlying Action. In the alternative, Charter

5

argues that it is not liable for the underlying settlement amount as damages for its purported breach of its duty to defend, as it did not have a duty to indemnify. Last, Charter argues that the Policy's exclusion of liability assumed in contract barred coverage for the portion of the underlying settlement that CGS paid to settle Walmart's liability.

## DISCUSSION

The parties do not dispute the material facts underlying the claim, but instead contest only the district court's interpretation of the Policy. "Because interpretation of an insurance agreement is a question of law, we review the district court's construction of the Policy de novo." VAM Check Cashing Corp. v. Fed. Ins. Co., 699 F.3d 727, 729 (2d Cir. 2012).

The parties agree that New York law governs this action. As we explained in Hugo Boss Fashions, Inc. v. Federal Insurance Co., New York law distinguishes between the duty to indemnify and the duty to defend, applying "very different presumptions" to each. 252 F.3d 608, 615 (2d Cir. 2001). In deciding whether an insurance policy requires an insurer to indemnify an insured's loss, we must first examine whether there is a "reasonable basis for a difference of opinion as to the meaning of the policy." Fed. Ins. Co. v. Int'l Bus. Machs. Corp., 18 N.Y.3d 642, 646 (2012) (internal quotation marks omitted). If there is, "the language at issue would be deemed to be ambiguous and thus interpreted in favor of the insured." Id. This is because "New York follows the maxim of *contra proferentem* in insurance cases: where the plain language of a policy permits more than one reasonable reading, a court must adopt the reading upholding coverage." VAM Check Cashing, 699 F.3d at 732.

6

The duty to defend is broader than the duty to indemnify and an "even stronger presumption in favor of coverage" applies. Hugo Boss, 252 F.3d at 615; see also Hanover Ins. Co. v. Cowan, 568 N.Y.S.2d 115, 116 (2d Dep't 1991). Even where the insurer ultimately has no duty to indemnify due to policy exclusions, it may still be "obligated to defend the insured until the applicability of the exclusions [is] determined." Hugo Boss, 252 F.3d at 615. To avoid the duty to defend, an insurer "must demonstrate that the allegations of an underlying complaint place that pleading solely and entirely within the exclusions of the policy and that the allegations are subject to no other interpretation." Id., quoting Hanover Ins. Co., 568 N.Y.S.2d at 116 .

In keeping with these principles, we now turn to Charter's various arguments.

## I.  Infringement of Title or Slogan

Charter argues that it had no duty to defend, still less to indemnify, CGS because the FF stitching is neither a "title" nor a "slogan" used in advertising, and that therefore the Underlying Action did not allege a covered "[i]nfringement of . . . title or slogan."

### A.  Infringement of Slogan

We first consider whether the FF stitching could be considered a "slogan." Our decision in Hugo Boss provides the framework for analysis, and indeed gives authoritative guidance as to the meaning of the term.

"[W]e begin with the terms of the [Policy] itself to see if the intent of the parties can be gleaned without resort to extrinsic evidence." Hugo Boss, 252 F.3d at 617. Here, as in Hugo Boss, the Policy fails to define "slogan" or to provide criteria for

7

distinguishing slogans from non-slogans.  Thus, the language of the Policy itself "is of no aid to us in deciding whether [the FF stitching] qualifies as a . . . slogan within the meaning of the contract" of insurance.  Id. (internal quotation marks omitted).

Next, we ask whether a body of law or an established custom fills in the gaps left by the drafters.  We concluded in Hugo Boss that New York state law did not provide significant insight into the meaning of "slogan," or any clear way to distinguish between slogans and non-slogans.  That is still the case; the parties cite, and we have found, no New York case law subsequent to Hugo Boss that provides further guidance on this issue. Nor is there an established industry usage that gives meaning to the term "slogan."  Id. at 618.

As we did in Hugo Boss, however, we may still find a policy term unambiguous where we can determine that it has a clear meaning in federal law.  "[C]ontracting parties operate against the backdrop not only of state law, but of *federal* law as well."  Id. (emphasis in original).  Thus, "where contracting parties use terms and concepts that are firmly rooted in federal law, and where there are no explicit signals to the contrary, we can presume that the prevailing federal definition controls."  Id.  In assessing whether there is such a "prevailing federal definition," we consider not whether there is complete unanimity among the courts that have addressed the question, but rather whether there is an "overwhelming current of judicial opinion," that is, a meaning used by "the vast majority of federal courts."  Id. at 619 & n.8.  In 2001, Hugo Boss found that the vast

8

majority of federal courts had defined "slogans"[4] as *phrases* used to promote or advertise a house mark or product mark, in contradistinction to the house or product mark itself." Id. at 618 (emphases altered).[5]  This was still true in 2009, when CGS purchased the Policy.  See Citizens Ins. Co. of Am. v. Uncommon, LLC, 812 F. Supp. 2d 905, 913 (N.D. Ill. 2011) (adopting Hugo Boss definition of slogan, and holding that "slogan" had acquired an unambiguous meaning by 2009).  We therefore conclude that the Hugo Boss definition of "slogan" remains controlling today.

---

[4] CGS argues that Hugo Boss does not govern our inquiry because it analyzed "trademarked slogan," not "slogan," and the majority relied on that invocation of federal trademark law to determine that the federal definition of "slogan" controlled.  While the policy at issue in Hugo Boss referred to "trademarked or service marked titles or slogans," 252 F.3d at 616, and CGS's policy refers merely to "slogan[s]," the distinction does not make a difference.  Hugo Boss and the federal cases it cited analyzed the definition of "slogan" itself, not "trademarked slogan."  See id. at 619-20 (citing cases).  A "trademarked slogan" is nothing more or less than a "slogan" that has been trademarked.

[5] Since Hugo Boss, other cases have adopted similar definitions of slogan.  See Interstate Bakeries Corp. v. OneBeacon Ins. Co., 686 F.3d 539, 546 (8th Cir. 2012) ("Two applicable dictionary definitions of 'slogan' are: (1) a word or phrase used to express a characteristic position or stand or a goal to be achieved and (2) a brief attention-getting phrase used in advertising or promotion." (internal quotation marks omitted)); Cincinnati Ins. Co. v. Zen Design Grp., Ltd., 329 F.3d 546, 556 & n.10 (6th Cir. 2003) (defining slogan as "a distinctive cry, phrase, or motto of any party, group, manufacturer, or person; catchword or catch phrase"; "A brief attention-getting phrase used in advertising or promotion"; "[A] phrase used repeatedly, as in promotion"; and "phrases used to promote or advertise a house mark or product mark, in contradistinction to the house or product mark itself" (internal quotation marks omitted)); Ultra Coachbuilders, Inc. v. Gen. Sec. Ins. Co., No. 02 Civ. 675, 2002 WL 31528474, at *3 (S.D.N.Y. July 15, 2002) (holding that a slogan is an "attention-getting phrase" or a "phrase used to promote or advertise a house mark or product mark" (emphases omitted)).

To hold that the stitching design on a jeans pocket is a "slogan" would stretch that definition beyond recognition, as the design is clearly not a "phrase." In <u>Hugo Boss</u> we rejected the notion that "the trademarked name of a brand, product, or company" constituted a trademarked slogan, and found it "clear that a 'slogan' must be something[] other than the house mark or product mark itself." 252 F.3d at 619 (emphases omitted). It follows that the FF stitching, which is also not a "phrase" and which in effect is a "house mark or product mark," is not a slogan either. "In light of this federal authority confirming this definition . . . and given the presumption that, unless they expressly indicate otherwise, contracting parties will be deemed to have incorporated into their agreements usages of key terms that are well-established in the case law or industry, we find no ambiguity sufficient to give rise to *contra proferentem* in this contract." <u>Id</u>. at 620.

Although we found the mark at issue in <u>Hugo Boss</u> so unambiguously not a slogan to defeat the duty to indemnify, in that case we also concluded that, because "under New York law, the insurer's duty to furnish a defense is broader than its obligation to indemnify," <u>id</u>. at 620 (internal quotation marks and citation omitted), sufficient uncertainty still remained about "whether [the meaning of] the term ['trademarked slogan'] was clear enough to avoid *contra proferentem*," <u>id</u>. at 622, to impose on the insurer a duty to defend the action.[6] Here, however, there is no such residual ambiguity.

---

[6] Then-Judge Sotomayor dissented from this part of the majority's opinion, contending that the "attempt to establish a two-tiered standard for legal clarity – requiring 'unambiguous'

10

Hugo Boss effectively settled the meaning of "slogan" in advertising injury policies in this Circuit, and as we have noted above, the parties have not cited any developments in case law or commercial understanding that would call that definition into question. The FF stitching is clearly and unambiguously not a "slogan" as that term is understood in law and used in insurance policies. Accordingly, insofar as the complaint in the Underlying Action rests on a claim of infringement of *slogan*, Charter had no duty to indemnify or defend.

B.      Infringement of Title

We next consider whether the FF stitching could be considered a "title."[7] Although Hugo Boss did not involve the definition of that term, its analysis remains instructive, and we follow its framework, laid out above, in addressing this issue. "Title" is not defined in the Policy, and neither New York state law nor industry usage provides significant insight into the meaning of title, so we must again look to federal case law.

The vast majority of federal cases are clear that in this context – that is, in a list that includes "copyright" and "slogan," but conspicuously does not include coverage of

---

legal terms to disclaim the duty to indemnify, but requiring unambiguous legal terms that courts will recognize with certainty to disclaim the duty to defend – finds no basis in New York law." Hugo Boss, 252 F.3d at 626 (Sotomayor, J., dissenting in part). While we acknowledge the force of the dissent, in the absence of intervening New York authority endorsing its conclusion, we remain bound by the majority's contrary analysis.

[7] CGS occasionally refers to Five Four's other marks, including one with the words "Five Four" in it, but as the Underlying Action concerned only infringement of the FF stitching, it is only the stitching with which we are concerned in this appeal.

11

infringement of "trademarks" – "title" means the name or appellation of a product, and does not cover design elements such as pocket stitching that may serve as a trademark designating the origin of the product. See, e.g., Houbigant, Inc. v. Fed. Ins. Co., 374 F.3d 192, 200 (3d Cir. 2004) (defining "trademarked title as any name, appellation, epithet, or word used to identify and distinguish the trademark holder's goods from those manufactured or sold by others"); A Touch of Class Imports, Ltd. v. Aetna Cas. & Sur. Co., 901 F. Supp. 175, 176-77 (S.D.N.Y. 1995) (noting that "title" is "a name or appellation" such as "Big Mac," "Chap Stick," and "Cheerios," and does not include trademarks such as the design of a package or location of a patch on a pair of jeans).[8] While a title need not contain words,[9] we have no difficulty in concluding that the

_____

[8] See also U.S. Test, Inc. v. NDE Envtl. Corp., 196 F.3d 1376, 1381 (Fed. Cir. 1999) ("We concur with the reasoning of several other courts that have construed the term 'title,' when grouped with the terms 'slogan' and 'copyright,' to mean 'name,' e.g., the name of a literary or artistic work, as opposed to the ownership of an invention." (emphasis omitted)); ShoLodge, Inc. v. Travelers Indem. Co., 168 F.3d 256, 259 (6th Cir. 1999) ("[T]he term 'title' is not ambiguous and . . . it does not include service marks, such as the name of a hotel or other establishment."); NorFab Corp. v. Travelers Indem. Cos., 555 F. Supp. 2d 505, 510 (E.D. Pa. 2008) ("[T]he word title as it appears in the insurance contract before us encompasses any distinctive name, appellation or epithet." (emphasis omitted)); Owens-Brockway Glass Container, Inc. v. Int'l Ins. Co., 884 F. Supp. 363, 368 (E.D. Cal. 1995) ("The term 'infringement of title' is part of a list that includes copyright and slogan. In company with these terms, 'title' apparently refers to a name, such as a name of a literary or artistic work, rather than to ownership of an invention or other thing."); cf. Acuity v. Bagadia, 750 N.W.2d 817, 824 (Wis. 2008) ("'Title' has been defined as a distinguishing name or a descriptive or distinctive appellation." (internal quotation marks omitted)).

[9] For example, the musician Prince Rogers Nelson, more commonly known simply as Prince, famously titled his 1992 album, sometimes called the "Love Symbol Album," with an unpronounceable symbol (" "), and by 1993 had adopted that symbol as his own "name or appellation." See Prince: Biography, Rolling Stone, http://www.rollingstone.com/music/artists/prince/biography (last visited July 7, 2013).

12

stitching on the back pocket of a pair of jeans cannot fairly be called the name or

appellation of that pair of jeans.[10]

While the definition of title is clear enough to bar Charter's duty to indemnify

CGS, our inquiry does not end there.  If there was any residual uncertainty as to whether a

court would find "title" unambiguous, then Charter still had a duty to defend, independent

of the duty to indemnify.  See Hugo Boss, 252 F.3d at 620-21.  The duty to defend is

broader than the duty to indemnify, and insurers may refuse to defend only "cases in

which the policy is so clear that there is no uncertainty in fact or law."  Id. at 620.

As noted above, in Hugo Boss, we held that even though a prior district court

decision advancing a competing interpretation of "slogan" did not render the term

ambiguous in the face of overwhelming consensus among courts, it *did* "render[]

uncertain the question of whether the courts would deem the term . . . to be

---

[10] We need not, and therefore do not, decide whether "title" is necessarily limited to literary or artistic works.  Some courts have so held.  See, e.g., Charter Oak Fire Ins. Co. v. Hedeen & Co., 280 F.3d 730, 735-36 (7th Cir. 2002) (holding that "infringement of title presumably involves titles of books, songs, products, services, and so forth and is not clearly limited . . . to the infringement of a noncopyrightable title of a creative work" (internal quotation marks omitted)); Nationwide Mut. Ins. Co. v. Mortensen, 222 F. Supp. 2d 173, 185 (D. Conn. 2002) ("'Title' in the 'advertising injury' provision does not refer to the title of a company, or a service mark, but rather refers to 'a distinctive name or designation used to identify a literary or artistic work.'"), quoting Julian v. Liberty Mut. Ins. Co., 682 A.2d 611, 615 (Conn. 1996); Atl. Mut. Ins. Co. v. Brotech Corp., 857 F. Supp. 423, 429 (E.D. Pa. 1994) ("[T]itle [is] a distinctive name or designation used to identify a literary or artistic work and [is not] the legal concept of ownership of property.").  But whether or not other sorts of products can have "titles" in the sense of "names or appellations," it is clear to us that the FF stitching does not function as the name of any particular pair of jeans or model line, but rather serves as a mark of the creator of the product, Five Four.

13

unambiguous." Id. at 620-21 & n.11 (emphasis omitted).  We face a similar situation here: while the vast majority of federal cases unambiguously define "title" to mean a word or phrase, a handful define title in a way that could arguably include a design or symbol similar to the pocket stitching at issue here.  For example, one court defined "title" as "names and related trademarks," then noted that "trademark" is defined as a "'word, name, symbol, or device, or any combination thereof used by a person . . . to identify and distinguish his or her goods.'"  Priceless Clothing Co. v. Travelers Cas. Ins. Co., No. 11 Civ. 555, 2011 WL 1900121, at *2 (N.D. Ill. May 19, 2011), quoting 15 U.S.C. § 1127; see also Zurich Ins. Co. v. Amcor Sunclipse N. Am., 241 F.3d 605, 608 (7th Cir. 2001) ("'title' refers to names and related trademarks").  Another court held that infringement of a stylized "D" logo fell under  "infringement of title."  Am. Econ. Ins. Co. v. Reboans Inc., 900 F. Supp. 1246, 1253-54 (N.D. Cal. 1994).[11]  These cases reason that because a trademark can be a title, and a symbol is a trademark, infringement of the symbol must qualify as infringement of title.

---

[11] See also Winklevoss Consultants, Inc. v. Fed. Ins. Co., 991 F. Supp. 1024, 1040 (N.D. Ill. 1998) (holding that emulating the way software functioned could not be infringement of title, because it was not "imitating how the software appeared physically," such as emulating "a distinctive mark describing the software or a name by which the software was known to the public"); Energex Sys. Corp. v. Fireman's Fund Ins. Co., No. 96 Civ. 5993, 1997 WL 358007, at *4 (S.D.N.Y. June 25, 1997) ("While an injury defined as an 'infringement of title' may not cover all trademark infringement claims, the language clearly suggests coverage of claims where there are allegations of infringing a company's mark or slogan.").

While the reasoning of these cases is faulty, as title and trademark are not coextensive, under the <u>Hugo Boss</u> framework these cases created enough legal uncertainty around the meaning of "title" to "give[] rise to (an at least temporary) duty to defend . . . until the uncertainty surrounding the term was resolved." <u>Hugo Boss</u>, 252 F.3d at 622. Although in our view there is not sufficient ambiguity to invoke the *contra proferentem* presumption that would trigger a duty to indemnify, there was nonetheless, at the time of the filing of the Underlying Action, sufficient uncertainty about the scope of coverage to trigger Charter's duty to defend. Its failure to defend therefore breached the Policy. To the extent Charter believed that the Underlying Action did not allege an infringement of title and was therefore not covered by the Policy, its remedy was to begin to defend CGS and immediately seek a declaratory judgment as to the meaning of "title." See <u>Hugo Boss</u>, 252 F.3d at 622-23.

## II.    Advertising Injury

Wholly apart from the issue regarding infringement of slogan or title, the Policy covers only "'[a]dvertising injury' caused by an offense committed in the course of advertising." Joint App'x 164. Charter next argues that the Underlying Action was not covered by the Policy because Five Four did not allege that its injury stemmed from CGS advertising the jeans.

In determining whether an insurer is obliged to defend a lawsuit against the insured, we examine the allegations in the complaint filed in that lawsuit. "If, liberally construed, the claim is within the embrace of the policy, the insurer must come forward to

15

defend its insured no matter how groundless, false or baseless the suit may be." Century 21, Inc. v. Diamond State Ins. Co., 442 F.3d 79, 83 (2d Cir. 2006) (internal quotation marks omitted). Otherwise stated, "[w]here allegations fall within the scope of the risks undertaken by the insurer, regardless of how false or groundless those allegations might be, there is a duty to defend." Id. at 82 (internal quotation marks omitted).

The Underlying Action's various amended complaints consistently alleged "wrongful acts, including advertising." Joint App'x 353, 374, 391, 443. While Charter argues that any allegations of advertising referred only to Walmart's actions, the last complaint filed, the Third Amended Complaint ("TAC"), alleged that *defendants* – which included both Walmart and CGS – advertised the jeans. Id. at 447-48. It is hardly a "strained, implausible" or "tortured and unreasonable" reading of the TAC to read it to allege advertising injury by CGS. Century 21, 442 F.3d at 82 (internal quotation marks omitted). If Charter believed that Five Four did not intend to allege advertising by CGS or that CGS did not advertise the jeans, Charter should have begun to defend and immediately sought a bill of particulars to resolve any ambiguity in the pleadings. See Hugo Boss, 252 F.3d at 622 (noting that "New York law permits the insurance company to extricate itself early by demanding a bill of particulars," and that "the duty to defend lasts only until the factual ambiguity is resolved in favor of the insurer").

Charter further argues that even if it initially had a duty to defend, that duty terminated once CGS and Walmart's discovery responses demonstrated that they had never advertised the jeans. Charter is correct that the duty to defend exists only "until it is

16

determined *with certainty* that the policy does not provide coverage." Id. at 620 (emphasis in original). However, Charter did not so argue below. Instead, it cited these discovery responses, incorrectly, as a reason why it had never had a duty to defend at all. Further, the stipulation with respect to damages entered by the parties below leaves open no reasonable basis on which to argue that the district court ruled on or rejected any claim about the size of the defense costs or whether the obligation to defend cut off at some particular point. Given the stipulation and Charter's failure to make this argument properly below, any argument that Charter's duty to defend terminated at some point during the course of the Underlying Action has been waived.

## III. The Knowing Violation Exclusion

Charter next argues that the Underlying Action fell within the Policy's "knowing violation" exclusion, as it was "explicitly premise[d] . . . on intentional copying." Appellant's Reply Br. 21. The policy excluded coverage for any "advertising injury" either committed by or at the direction of the insured "with the knowledge that the act would" inflict advertising injury, or arising out of the publication of material, if done by the insured "with knowledge of its falsity." Joint App'x 164. Charter argues that this "knowing violation" exclusion meant that it did not have to defend the Underlying Action, which alleged "willful" infringement.

An insurer may refuse to defend "only if it could be concluded as a matter of law that there is no possible factual or legal basis on which [the insurer] might eventually be held to be obligated to indemnify [the insured] under any provision of the insurance

17

policy." Servidone Constr. Corp. v. Sec. Ins. Co. of Hartford, 64 N.Y.2d 419, 424 (1985) (internal quotation marks omitted). "If the allegations of the complaint are even potentially within the language of the insurance policy, there is a duty to defend." Town of Massena v. Healthcare Underwriters Mut. Ins. Co., 98 N.Y.2d 435, 443 (2002). Therefore, where several claims arise from the same set of facts, if any of the claims are covered by the policy, the insurer "consequently has a duty to defend the entire action brought under any of the . . . policies," including the uncovered claims. Id. at 445; see also BP Air Conditioning Corp. v. One Beacon Ins. Grp., 8 N.Y.3d 708, 714 (2007) (same).

Despite the boilerplate allegation of willful misconduct, Five Four's Lanham Act section 43(a) claim did not require it to prove that CGS intended to infringe on its trademark, as such a claim does "not require proof of intent to deceive." Johnson & Johnson v. Carter-Wallace, Inc., 631 F.2d 186, 189 (2d Cir. 1980). Our inquiry ends there: as at least one of the claims in the Underlying Action did not require intent, Charter was required to defend the entire action.[12]

---

[12] The cases cited by Charter, in which the insurance company did not have a duty to defend because the insured had not shown or could not show, given the nature of the offense, that its infringing conduct was unintentional, are distinguishable. In Atlantic Mutual Insurance Co. v. Terk Technologies Corp., the defendant "approached a local manufacturer to produce a cheaper, low-quality knock-off of the CD 25; marketed the counterfeit product in packaging indicating it was a genuine Larsen creation manufactured in Denmark, both blatantly false; and then fraudulently misled Larsen when he inquired as to poor sales, indicating that demand was low, whereas the counterfeit product was enjoying vigorous sales." 763 N.Y.S.2d 56, 64 (1st Dep't 2003). In A.J. Sheepskin & Leather Co. v. Colonia Insurance Co., the plaintiff was "a 'serial infringer' that had 'deliberately sought to confuse

18

## IV. Damages

As noted above, the complaint in the Underlying Action alleged a potentially unintentional infringement of title in the course of advertising that triggered Charter's duty to defend the entire action. Charter's breach of that duty, however, does not entail an obligation to pay the settlement amount in the absence of a duty to indemnify. "The narrower duty to indemnify arises only if the claim for which the insured has been judged liable lies within the policy's coverage." Allianz Ins. Co. v. Lerner, 416 F.3d 109, 115 (2d Cir. 2005). In Servidone Construction, the New York Court of Appeals held that "an insurer's breach of [its] duty to defend does not create coverage and that, even in cases of negotiated settlements, there can be no duty to indemnify unless there is first a covered loss." 64 N.Y.2d at 423; see also Stellar Mech. Servs. of N.Y., Inc. v. Merch. Ins. of N.H., 903 N.Y.S.2d 471, 476 (2d Dep't 2010); Hotel des Artistes, Inc. v. Gen. Accident Ins. Co. of Am., 775 N.Y.S.2d 262, 271 (1st Dep't 2004) ("[I]t is impermissible for a court to enlarge[] the bargained-for coverage as a penalty for breach of the duty to defend." (alteration in original) (internal quotation marks omitted)). As noted above, while the uncertainty around the meaning of "title" gave rise to a duty to defend, there

_____

the public' by selling goods nearly identical to [another's]." 709 N.Y.S.2d 82, 83 (1st Dep't 2000). Here, the complaint alleges merely that CGS sold jeans with similar pocket stitching to Five Four's jeans, not that CGS marketed the jeans as genuine Five Four jeans, or that it was a serial infringer. From the facts alleged in the complaint, unlike in Atlantic Mutual or A.J. Sheepskin, it is possible that CGS unintentionally infringed on Five Four's pocket design.

19

was not sufficient ambiguity to give rise to a duty to indemnify, and Charter is therefore not liable for CGS's settlement.[13]

## V.     Effectiveness of the Web Xtend Liability Endorsement

CGS's original policy with Charter contained a broader definition of "advertising injury," which included, *inter alia*, coverage for trade dress infringement.  That provision, however, was eliminated by an endorsement to the policy, which the parties refer to as the "Web Xtend Endorsement."  On appeal, CGS raises a new argument, not raised or addressed below, that the Web Xtend Endorsement did not effectively amend the Policy.

Although the argument was not raised below, we exercise our discretion to address it, to spare the district court from having to consider such a frivolous argument on remand.  The Web Xtend Endorsement unambiguously stated that the previous advertising injury language was "deleted and replaced by the following," and included a header stating in all caps and bold: "**THIS ENDORSEMENT CHANGES THE POLICY.  PLEASE READ IT CAREFULLY.**"  Joint App'x 164.  CGS refers to language stating that the endorsement "broadens coverage"; however, that language is part of an entirely different endorsement, and is not present in the Web Xtend Endorsement.

---

[13] As Charter is not liable for *any* of the settlement, we need not reach its argument that the Policy's contractual liability exclusion relieves it of liability for the portion of the settlement attributable to Walmart's liability.

"[I]t is settled that in construing an endorsement to an insurance policy, the endorsement and the policy must be read together, and the words of the policy remain in full force and effect except as altered by the words of the endorsement." County of Columbia v. Cont'l Ins. Co., 83 N.Y.2d 618, 628 (1994). Here, the endorsement unambiguously altered the original Policy, which therefore no longer governs the scope of CGS's coverage.

## CONCLUSION

For the foregoing reasons, the judgment of the District Court is hereby VACATED and the case is REMANDED for further proceedings consistent with this opinion.